392 So.2d 619 (1980)
STATE of Louisiana
v.
James C. WILLIAMS.
No. 64987.
Supreme Court of Louisiana.
March 3, 1980.
On Rehearing September 12, 1980.
*620 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Tim M. Screen, Kay Kirkpatrick, Asst. Dist. Atty., for plaintiff-appellee.
L. Wayne Paxton, Nathan Wilson, Baton Rouge, for defendant-appellant.
Richard E. Shapiro, New Orleans, amicus curiae, for Southern Prisoners Reform Committee.
BLANCHE, Justice.
The defendant, James C. Williams, was convicted of first degree murder in violation of R.S. 14:30 and sentenced to death. On appeal, he urges eight assignments of error.
On August 3, 1977, at approximately 12:45 a. m., a man armed with a pistol approached the manager, Elmo Plains, of the Stadium Exxon station in Baton Rouge, Louisiana and demanded the cash that he had in his hand. Mr. Plain refused and started to walk away when the robber shot him, grabbed the money from his hand, and then ran. James Williams was arrested the following day and at a line-up, he was positively identified by three of the eyewitnesses.

Assignment of Error Number 1
By this assignment, the defendant contends that the trial court erred in refusing to grant his motion to quash the indictment, and in permitting the state's amendment of the indictment filed against him. The defendant was indicted by the East Baton Rouge Parish Grand Jury on October 26, 1977, and the bill of indictment states in pertinent part:
"... James C. Williams committed the offense of first degree murder as defined by Louisiana Revised Statute Title 14; Section 30(1) in that he committed first degree murder of Elmo Plain ..."
By Act No. 109, § 1, the legislature, in 1973, amended La.R.S. 14:30 to provide in pertinent part as follows:
"First degree murder is the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm and is engaged in the perpetration of aggravated kidnapping, aggravated rape, or armed robbery; ..."
In 1976, R.S. 14:30 was amended again by Act No. 657, § 1 to read as follows:
"First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm ..." (As amended by Acts 1976, No. 657, § 1).
Clearly, there was an improper citation in the indictment since the effective law at the time of the offense was the 1976 amendment. In order to correct this citation, the indictment was amended prior to trial to read "14:30" rather than "14:30(1)". La.C.Cr.P. art. 464 establishes the rule regarding improper citations as follows:
"The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute *621 which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice."
There must be a showing of prejudice by the defendant, State v. Brown, 338 So.2d 686 (La.1976), and none has been shown. The charge of first degree murder is clearly stated in the body of indictment. Further, counsel for the defendant was fully aware that R.S. 14:30(1) was no longer in effect at the time of the offense, and since there was no showing of prejudice to the defendant, the court properly allowed the amendment of the indictment prior to trial. La.C.Cr.P. art. 487; State v. de la Beckwith, 344 So.2d 360 (La.1977).
This assignment is without merit.

Assignment of Error Number 2
By this assignment, the defendant contends that the trial court erred in not forcing the state to reveal the identity of Officer Gill's confidential source. On direct examination by the state, Officer Gill stated that the name of the defendant as a possible suspect had first come to his attention through a confidential source. He also noted that the informant had not been a witness to the offense. The defendant claims that the court's refusal to allow disclosure of the informant denied him his Sixth Amendment right to confront witnesses against him.
The informer privilege is a right which the state has to withhold the identity of one who supplies information to law enforcement officials concerning crime. It is founded upon public policy and seeks to advance the public interest in effective law enforcement. State v. Williams, 347 So.2d 184 (La.1977). However, the privilege must give way where the disclosure of an informant's identity or of the contents of his communication is relevant and helpful to the defense of an accused, or to the fair determination of an issue before the court. State v. Dabon, 337 So.2d 502 (La.1976); see also Roviaro v. U. S., 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Disclosure of the informant's identity in this case would in no way be relevant to the defendant's case because it would have no bearing on the issue of his guilt or innocence. The confidential source here was not a witness to, or a participant in, any act for which the defendant was on trial. Therefore, the defendant was not entitled to the identity of the confidential source since this information was neither relevant nor helpful to his defense. See State v. Dabon, supra; State v. Beal, 344 So.2d 1012 (La.1977).
This assignment lacks merit.

Assignment of Error Number 3
By this assignment, the defendant contends that the trial court erred in refusing to allow him to call three defense witnesses on the ground that the defense had failed to advise the state that said witnesses would be called to support the defendant's alibi.
Louisiana Code of Criminal Procedure, art. 727, provides in part as follows:
"A. Upon written demand of the district attorney stating the time, date and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi."
The purpose in providing for discovery in this area is to prevent surprise and delay at the trial level. The article provides for reciprocal discovery by the defendant of the state's witnesses who tend to prove the defendant's presence at the scene of the crime. As an enforcement measure, C.Cr.P. art. 727 provides for the exclusion of undisclosed witnesses as follows:
"D. Upon the failure of either party to comply with the requirements of this *622 rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf."
The defendant's proof of alibi is based upon his testimony that he had left his girlfriend's home earlier in the evening and had gone to his mother's home. There, he watched television with the three witnesses in question. He also testified that he left there at 11:30 p. m. and went directly to Shelby's Bar, where he stayed until approximately 2:00 a. m., at which time he was picked up by his girlfriend. His girlfriend testified that after having stepped out for a while, she returned to find a message to call the defendant at Shelby's Bar. After having returned his call, she drove to the bar and picked him up.
The defendant called Mildred Douzier, one of the barmaids at Shelby's Bar. She testified that the defendant did not arrive at the bar until 1:45 a. m., and further testified that she did not receive a phone call for the defendant at any time that night. Emanuel Campbell, the owner of Shelby's Bar, was also called by the defendant. He testified that he was sleeping that night and never saw Mr. Williams in the bar. Mildred Price, the defendant's girlfriend's daughter, testified that she received three phone calls from the defendant that night in which he stated that he was at Shelby's Bar.[1]
The trial judge's decision that the witnesses were alibi witnesses is not erroneous. Defendant's sole defense was that he was somewhere else when the crime was committed. To support counsel's argument that they could not be alibi witnesses, he asserted to the court that the witnesses had no idea as to the whereabouts of the defendant at the time of the commission of the crime, and had not known of his whereabouts for one hour and fifteen minutes. When questioned as to the relevance of the testimony, counsel replied he could show that as a mitigating circumstance, the defendant had been drinking that night with the witnesses. Whatever possible advantage could have come from the mitigating nature of this testimony was later destroyed when the defendant took the stand and testified that he was not drunk. Thus, if the purported testimony to be elicited was relevant, it was later repudiated by defendant's own testimony, and no possible harm could have resulted from its exclusion.
In brief, however, defendant's argument, and one not made to the trial judge, takes a different course. Here, it is asserted that the testimony of these witnesses would corroborate the defendant's statement as to the time he left his mother's home (45 minutes before the commission of the crime), and where he was going (Shelby's Bar), the manner in which he was dressed, and his hairstyle. Defendant testified that he had on blue slacks and a red and blue tank shirt, and that his hair was braided. However, the witnesses at the scene of the crime described the perpetrator of the crime as having worn blue jeans, a long-sleeved shirt, and a cap with a zipper.
If the testimony was to show that someone who perpetrated the crime was dressed differently than defendant so, therefore, he could not have been the one at the scene of the crime, then such testimony would have been in support of his alibi that he was not there, and was properly excluded for failure to comply with La.C.Cr.P. art. 727.
On the other hand, if the testimony was merely to corroborate the defendant's testimony concerning when he left his mother's home, his place of destination and his dress, such testimony was, in fact, elicited from his girlfriend, who picked him up at Shelby's Bar at 2:00 a. m. She also corroborated his testimony regarding his dress by stating that he did not wear blue jeans, nor did she see him wearing a blue cap with a zipper. Testifying differently than defendant, *623 she described his hairstyle as a "bush". Although the proferred testimony from the defendant's three relatives was purportedly for purposes of corroboration, it was likewise for the purpose of strengthening the defendant's alibi. Thus, its exclusion for mere corroboration as to time, destination and dress was, in fact, harmless, and if otherwise to strengthen his alibi, there again it was properly excluded for failure to comply with C.Cr.P. art. 727.
Defendant also argues in the alternative that the trial judge is given discretion under art. 727(E) to grant an exception "for good cause shown to any of the requirements of subsections A through D" and that he abused that discretion where he excluded the witnesses' testimony.
A few days before trial, Mr. Achee, one of the defense counsel, withdrew from the case, and Mr. Nathan Wilson was appointed to represent the defendant at trial. Mr. Wilson was first contacted about the trial on October 17, 1978, and first conferred with the defendant on October 20, 1978, three days before the trial. On October 22, 1978, Mr. Wilson learned from co-counsel of the existence of three witnesses who could testify that the defendant was drinking at his mother's home until 11:30 p. m. At trial, after the state had completed its case-in-chief, Mr. Wilson attempted to use these three witnesses.
Although defense counsel maintains that he was not aware of the existence of these three witnesses until the day before the trial, his co-counsel was apparently aware of their existence before that time. Further, even upon discovery of these witnesses, the defendant failed to give the state any type of notice, and chose, rather, to maintain silence as to their existence until the completion of the state's case-in-chief.[2] Under these facts, we can not say that the trial court abused its discretion.
For these reasons, we find this assignment is without merit.

Assignments of Error Numbers 4 and 5
By these assignments, the defendant urges that the trial court erred in denying his motion in arrest of judgment and his motion for a new trial. The defendant maintains that by excluding those jurors who absolutely refused to impose a sentence of death, he was denied his right to a fair and impartial trial on the merits. La.Const. art. 1, § 16.
In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court dealt with a similar argument. In Witherspoon, the defendant challenged the exclusion of jurors who indicated that they had reservations about imposing a sentence of death. Witherspoon had maintained that such a jury, unlike one chosen at random from a crosssection of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to death is the kind of juror who would too readily ignore the presumption of innocence and return a verdict of guilty.
The U.S. Supreme Court rejected that argument in stating:
"The data adduced by the petitioner however are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." 391 U.S. at 517-18, 88 S.Ct. at 1774-1775.
The defendant, however, maintains that Witherspoon is not dispositive of the instant case because here, we are dealing with a *624 bifurcated trial. We conclude that this distinction is without merit. In both this case and in Witherspoon, the same jury which decided the defendant's guilt also decided the issue of the sentence. The only significant difference between the procedure in Witherspoon and this case is that the bifurcated scheme provides for consideration by the jury of additional evidence at the sentencing portion. Such a difference would not make Witherspoon and its rationale inapplicable to this case.
These assignments are without merit.

Assignment of Error Number 8
By this assignment of error, the defendant argues that the trial court erred in allowing the systematic exclusion of jurors who expressed reservations about imposing the death penalty. It is well established that challenges for cause are properly allowed where the prospective juror refuses to impose the death penalty under any circumstances. See Witherspoon v. Illinois, supra; Davis v. Ga., 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).
The La.C.Cr.P. art. 798(2) incorporates the Witherspoon rationale as follows:
"(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt: ..."
A review of the voir dire examination reveals that the challenges granted for cause met the standard of La.C.Cr.P. art. 798. For this reason, the challenges for cause were properly allowed by the trial court.
This assignment is without merit.

Assignments of Error Numbers 6 and 7
By these assignments, the defendant contends that the trial court erred in failing to instruct the jury that if a unanimous "life" or "death" verdict could not be reached that the defendant would be sentenced to life imprisonment.
The defense complaint centers around the following portion of the trial judge's instructions:
"I admonish you ladies and gentlemen that all twelve of you must concur to render a decision and I am sure in view of the gravity of this matter you will weigh the evidence carefully so that your decision will be consistent to justice to all parties concerned. If you need additional clarifying instructions, do not hesitate to ask for them through your foreman, as we did at the guilt determination phase of this trial."
After having deliberated for approximately three hours, the jury returned to the courtroom seeking additional instructions. The jury foreman asked again if the jury's recommendation had to be unanimous. In response, the judge stated, "Your recommendation, whatever as to the two, either death or life imprisonment without benefit must be unanimous, must." The jury foreman then stated that they were deadlocked. The judge then asked if more time would help, and the foreman asked if they could deliberate thirty to forty minutes more. Subsequently, the jury returned a recommendation of death.
In brief, counsel for defendant urges that it was reversible error for the trial court to fail to instruct the jury as to the consequences of their failure to return a unanimous verdict.[3]
Judge Covington's charge was a proper statement of the jury's role in the sentencing *625 procedure. La.C.Cr.P. art. 905.6 does require a unanimous decision from the jury before it may make any recommendation. Thus, the trial court's instructions were a correct statement of the law as it applied to the jury's role. Counsel's complaint is that the trial judge failed to explain his duty under C.Cr.P. 905.8 to impose a sentence of life imprisonment absent a jury recommendation. A similar argument was made in State v. Myles, 389 So.2d 12, rehearing granted, and was rejected.
Just as there is no need to tell the jury at the guilt determination phase of the trial what the consequences are for a failure to reach a verdict (a mistrial), neither is there a need to inform them of the consequences if they should fail to make a recommendation (life imprisonment). Here, the jury was properly instructed as to their possible course of action. They were told that any recommendation they made must be unanimous. The jury was instructed that "In order to recommend the death sentence you must first find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance." They were further instructed:
"After this impartial consideration of all that evidence, ladies and gentlemen, you are not convinced to a moral certainty that at least one of the aggravating circumstances existed at the time of the offense, then, of course, if the state does not prove that the existence of that one circumstance beyond that point, it is your duty to recommend a sentence of life imprisonment without benefit of probation, parole or suspension of sentence."
Thus, we conclude that it is clear from the judge's instructions that the jury could not return a recommendation for death without first finding beyond a reasonable doubt that at least one aggravating circumstance existed and that the presence of any mitigating circumstances did not render such a sentence inappropriate.
The trial court's instructions were clear. We will not assume that the jury ignored these instructions and their duty simply for the sake of convenience. See State v. Mathews, 380 So.2d 43, (La.1979).
For these reasons, we find the assignment is without merit.

Sentence Review
Rule 905.9.1 requires a mandatory review when the death penalty is imposed by this Court to determine if the sentence is excessive. The rule sets forth three criteria of review as follows:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and (b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and (c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
We have reviewed the record and have not found any factors which would indicate that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors. Both the defendant and the victim were black, and members of the defendant's race were represented on the jury. Although the victim's wife testified at the sentencing portion of the trial, we have previously found that such testimony is not an arbitrary factor influencing the jury's decision. State v. Prejean, 379 So.2d 240 (La.1979).
The jury found one aggravating circumstance:
"(a) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery."
The evidence amply supports this conclusion. The eyewitnesses testified that the assailant demanded money from the victim and when he refused to comply, shot him and took the money from the victim's hand. There is no evidence in the record to controvert their testimony as to the manner in which the offense was committed.
In compliance with Section 3 of Rule 28, the trial judge completed and filed a uniform sentence report. We have reviewed both this report and the pre-sentence investigation *626 report provided by the Louisiana Department of Corrections. The defendant, at the time of the offense, was a 37-year-old black male, separated, with two children. He completed school through the tenth grade and has held several different jobs. Although the defendant had no juvenile record, he had as an adult been convicted on six misdemeanor charges. At the time of the offense, the defendant was on active probation after a conviction for simple burglary.
Although defense counsel argued at trial intoxication as a mitigating circumstance, the defendant's own testimony was that he was not drunk the night of the offense and was fully aware of his actions.
Section 4(b) of Rule 28 of this Court requires the district attorney to include in his sentence review memoranda a synopsis of each first degree murder case in the district in which the sentence was imposed after January 1, 1976. The purpose of this requirement is to aid this Court in determining whether the sentence is disproportionate to the penalty imposed in similar cases.
Since January 1, 1976, there have been 28 first degree murder indictments filed in East Baton Rouge Parish, with 12 resulting in guilty of first degree murder verdicts. Of these 12, 3 defendants received the death penalty. A comparison with these cases does not reveal that the sentence is disproportionate. In fact, although the East Baton Rouge juries have been reluctant to impose the death penalty, the only 3 cases in which the penalty was imposed were in first degree murders arising out of armed robberies. See State v. Williams, No. 65,563, appeal pending; State v. Clark, No. 66,573, appeal pending. In all three cases, the defendant was the one who actually did the killing.[4] Thus, in those cases which are most similar to the defendant's, the same penalty was imposed. A review of the other first degree murder convictions in East Baton Rouge shows a dissimilarity between them and the instant case in that there were arguably no aggravating circumstances,[5] or there were present mitigating circumstances which justified the jury's recommendation of life imprisonment.[6]
After having considered the above factors, we are unable to conclude that the sentence imposed here is disproportionate to that imposed in other cases considering both the crime and the defendant.

DECREE
For the above reasons, the sentence and conviction of the defendant are affirmed.
AFFIRMED.
DIXON, C. J., dissents, disagreeing with treatment of Assignments of Errors 3 and 8 and believing the parish-wide (not statewide) sentence review inadequate.
CALOGERO, J., dissents and assigns reasons.
DENNIS, J., dissents with reasons.
CALOGERO, Justice, dissenting.
I believe that Assignment of Error No. 3 has merit for the reasons assigned in dissent by Justice Dennis. Accordingly, I would reverse the conviction and order defendant tried over. Consequently I would not find it necessary in this case to decide the serious issue presented by the Assignment of Error concerning whether the jurors in a capital sentence hearing must be informed of the consequence of their vote in the event they are unable to agree unanimously upon a recommendation.
*627 DENNIS, Justice, dissenting.
I respectfully dissent.
Defendant, James C. Williams, appeals from his death sentence and first degree murder conviction contending that the trial court erred when it (1) excluded the testimony of three defense witnesses as a sanction for defendant's failure to make pretrial disclosure of their names as alibi witnesses; and (2) during the penalty stage of the trial, failed to inform the jury that, if it was unable to agree unanimously upon a recommendation, the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. In my opinion the trial court erred in both instances; the defendant's conviction and sentence should be reversed and the case remanded for a new trial. Pretrial notice to the prosecution of the defendant's intention to call the witnesses was not required because their testimony was not offered to establish defendant's absence from the scene of the crime at the time of its commission. In giving jury instructions during the penalty stage of the trial, the trial court was obliged to inform the jurors fully as to the consequences of their penalty recommendations; where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed so as to minimize the risk of arbitrary and capricious action.
Additionally, the sentence of death in this case is disproportionate when compared with other similar cases.

Denial of Defendant's Right to Call Witnesses
On August 3, 1977, at approximately 12:45 a. m., a man armed with a pistol approached Elmo Plain, the attendant of the stadium Exxon station in Baton Rouge, and demanded the money in his hand. When Plain refused and started to walk toward a customer at the gasoline pumps, the robber shot Plain, seized the money and fled. Plain died within minutes of a single gunshot wound. James Williams was arrested the next day and positively identified at a lineup as the assailant by three eyewitnesses.
The prosecution's eyewitnesses identified Williams as the murderer at trial. However, neither the murder weapon nor the money was recovered or introduced at trial. Williams testified to the jury that he was not the killer. He maintained that on the night of the offense he left his mother's house at about 11:30 p. m. and went to Shelby's Bar and Lounge where he remained until nearly 2:00 a. m.
Pursuant to La.C.Cr.P. art. 727 the prosecution served Williams before trial with a written demand for notice of his intent to assert an alibi defense, stating that "the crime occurred after 12:00 a. m., August 3, 1977 at Stadium Exxon, 1300 Scenic Highway." Williams responded that at the time of the crime he was in Shelby's Bar and Lounge, 1752 North Acadian Thruway, Baton Rouge, giving the names or place of employment of four alibi witnesses: the bar owner, two barmaids and Williams' common-law wife.
Following a prosecution objection at trial, the trial court excluded the testimony of three defense witnesses on the ground that they were alibi witnesses whose identity had not been disclosed in response to the state's demand. The defense attorney argued that the witnesses, all relatives of the defendant, were not within the ambit of the alibi disclosure rules. Because the crime occurred over thirty minutes after they had last seen defendant at 11:30 p. m. at his mother's house three blocks from the Stadium Exxon, he contended that their testimony could not establish an alibi. The prosecuting attorney did not withdraw his objection but seemed to agree that testimony pertaining to Williams' presence at his mother's house before 11:30 p. m. did not tend to establish alibi. Nevertheless, the trial judge adhered to his ruling stating that he would exclude testimony from any undisclosed witness which "points in the direction of alibi." The defense attorney *628 objected timely and assigned the trial judge's ruling as error.
Article 727 of the Code of Criminal Procedure is identical to Rule 12.1 of the Federal Rules of Criminal Procedure.[1] Section A of the article requires a defendant to disclose, upon receipt of a written prosecution request, whether he intends to offer an alibi defense, the place where he claims to have been at the time the alleged offense was committed, and the names and addresses of the witnesses upon whom he intends to rely in attempting to establish his alibi. Section B requires reciprocal disclosure of witnesses uncovered by the prosecution who will refute the alibi and Section C makes the duty to disclose a continuing obligation for both parties. Section E authorizes the trial court to excuse a party from compliance with the disclosure requirements upon a showing of good cause, and Section D empowers him to penalize unexcused noncompliance by excluding the testimony of undisclosed witnesses, except the defendant himself, offered by either party as to the defendant's absence from or presence at, the scene of the alleged offense.
The issue presented here is whether a witness whose testimony does not tend to establish the defendant's absence from the scene of the alleged offense, but whose testimony is otherwise consistent with the defendant's alibi defense, must be disclosed by the defendant in response to the prosecution's written demand for notice of alibi. Fundamentally, this case will determine if the rule authorizing a preclusion of testimony for failure to disclose defense alibi witnesses is to be strictly or broadly construed.
In my opinion, the rule authorizing the trial judge to invoke the sanction of Louisiana Code of Criminal Procedure article 727(D) must be construed strictly in order not to impinge on a defendant's constitutional rights to compel the attendance of witnesses and to present a defense. The Sixth Amendment's guarantee that "the accused shall enjoy the right to ... have compulsory process for obtaining witnesses in his favor" includes "[t]he right to offer the testimony of witnesses ... the right to present a defense, the right to present the defendant's version of the facts ...." Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Article 1, § 16 of the 1974 Louisiana Constitution expressly provides that "[a]n accused is entitled... to compel the attendance of witnesses, to present a defense ...." Whether *629 and to what extent a state can "enforce discovery rules against a defendant who fails to comply, by excluding relevant, probative evidence" has been expressly recognized and left open by the Supreme Court as a question raising Sixth Amendment issues. Wardius v. Oregon, 412 U.S. 470, 472, n. 4, 93 S.Ct. 2208, 2211, n. 4, 37 L.Ed.2d 82 (1973); Williams v. Florida, 399 U.S. 78, 83, n. 14, 90 S.Ct. 1893, 1896, n. 14, 26 L.Ed.2d 446 (1970).
While the Supreme Court has not decided the propriety of excluding a defendant's evidence because of noncompliance with criminal discovery rules, it has held, in three well known cases that a state may not enforce other types of statutory rules which infringe upon a defendant's Sixth Amendment rights. A rule prohibiting principals, accomplices, or accessories to the crime from being defense witnesses has been held unconstitutional when balanced against the defendant's right to present his defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). A voucher rule and a rule against admitting hearsay testimony may not be applied so as to deprive a defendant of his right to present a defense guaranteed by the Sixth Amendment. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). A state's juvenile records privilege statute must yield to a defendant's right to present a defense when it is necessary to inquire into the records to discover a prosecution witness's possible bias. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). See also, United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
Accordingly, there is ample ground for argument that a preclusion of a criminal defense witness's testimony to enforce discovery rules is contrary to both the Sixth Amendment and Article 1, § 16 of the 1974 Louisiana Constitution. See also, Pugh and McClelland, Work of the Louisiana Appellate Courts, 1973-74 Term, Evidence, 35 La.L.Rev. 544 (1975); Clinton, The Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials, 9 Ind.L. Rev. 711 (1976); Western, The Compulsory Process Clause, 73 Mich.L.Rev. 71 (1974). Furthermore, even if we, as the Supreme Court in Wardius v. Oregon, supra, and Williams v. Florida, supra, set to one side, without deciding, this constitutional issue, the tension and possible conflict between the preclusion device and a defendant's right to present a defense are plainly evident and require that the sanction be construed narrowly and used sparingly.
When La.C.Cr.P. art. 727(D) is construed strictly and applied to the situation presented by this case, it is clear that the trial judge erred in excluding the testimony of the defense witnesses as undisclosed alibi evidence. The statute required the defendant, upon giving notice of an alibi defense, to state "the names and addresses of the witnesses upon whom he intends to rely to establish such alibi." La.C.Cr.P. art. 727(A). If the defendant had failed to comply, the trial judge was authorized to "exclude the testimony of any undisclosed witness offered by [defendant] as to the defendant's absence from ... the scene of the crime." La.C.Cr.P. art. 727(D). The precluded testimony of the three defense witnesses clearly would not have tended to establish an alibi or to prove the defendant's absence from the scene of the crime. On the contrary, the testimony of these witnesses, insofar as the location of the defendant at the time of the offense, was no more probative of the defendant's alibi than it was of the prosecution's case.
The preclusion of testimony by the defendant's witnesses was unwarranted and denied him his rights to offer testimony and to present a defense. This error alone requires reversal of his conviction. However, our attention has been called to another reversible error which allegedly occurred during the penalty stage of the trial.

Failure to Inform Jurors of Consequences of Their Action
Following a verdict of guilty, a sentencing hearing was conducted before the same jury that determined the issue of guilt. *630 The prosecution, in asking for the death penalty, relied on the evidence offered at the trial on the issue of guilt and the testimony of the victim's widow who described her deceased husband as a helpless, partial paralytic. The defendant testified to the jury protesting his innocence again and asking the jurors to impose the death sentence if they did not believe him. The jury was informed that the defendant, who was thirty-seven years old, had a criminal record consisting of one felony, a simple burglary in 1973, and several misdemeanors.
The jurors retired after hearing the evidence of aggravating and mitigating circumstances and being given instructions by the judge. Following a period of deliberation of approximately three hours the jury returned to the courtroom where a colloquy occurred between the trial judge and the jury foreman.[2] In essence, the jury foreman asked if the jury's recommendation had to be unanimous. The trial judge informed the jury that its "recommendation, whatever, as to the two, either death or life imprisonment without benefitmust be unanimous. Must." The foreman responded that, at that time, the jury could not reach a decision. However, when the judge inquired if further deliberation would be useful and indicated the jury could be brought back the next day after being given food and rest in sequestration, the foreman requested leave for the jury to deliberate for another thirty to forty minutes. After an additional period of deliberation lasting forty-five minutes, the jury returned and unanimously recommended that the defendant be sentenced to death, assigning the armed robbery as an aggravating circumstance. This occurred at the end of a seven-day trial on the issue of guilt and a one-day sentencing hearing.
The trial judge did not inform the jury either in his general or additional instructions that its inability unanimously to agree on a recommendation would require the court to impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. The issue presented is whether the jurors in a capital sentence hearing must be informed of the consequence of their votes in the event they are unable to agree unanimously on a recommendation.
The constitutional prohibition against cruel, unusual or excessive punishment mandates that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). See also, Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The death penalty may not be imposed under sentencing procedures that create a substantial risk that it will be inflicted in an arbitrary and capricious manner. Gregg v. Georgia, supra, 428 U.S. at 153, 96 S.Ct. at 2909, 49 L.Ed.2d at 859. Moreover, in a case in which the penalty is determined by the jury rather than by the judge, the jurors, in order to perform their function as *631 a rational "link between contemporary values and the penal system," Witherspoon v. Illinois, 391 U.S. 510 at 519 n. 15, 88 S.Ct. 1770, at 1775 n. 15, 20 L.Ed.2d 776 (1968), must be fully informed of the consequences of their verdicts, including the penalties involved. State v. Washington, 367 So.2d 4 (La.1978); State v. Milby, 345 So.2d 18 (La. 1977); see State v. Prater, 337 So.2d 1107, 1109, 1110 (La.1976) (Tate, J., concurring) (Calogero, J., dissenting).
In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. They were not told that, by their failure to decide unanimously, they would in fact decide that the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. Instead, the members of the sentencing body were left free to speculate as to what the outcome would be in the event there was not unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required.
Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings. Consequently, by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action. The death penalty was imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.
The penalty of death is qualitatively different from a sentence of imprisonment. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Gardner v. Florida, 430 U.S. 349, 362, 97 S.Ct. 1197, 1206, 51 L.Ed.2d 393 (1977) (White, J., concurring); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
The effect of the error here involved was in all likelihood prejudicial. If only one of the twelve jurors was swayed by the failure to inform him fully of the consequence of his sentence recommendation, then, in the absence of that error, the death penalty would not have been imposed.

Disproportion of Sentence
Since January 1, 1976, there have been twenty-eight first degree murder prosecutions in East Baton Rouge Parish. In some instances, however, these cases reveal inordinately large discrepancies in sentencing.
Several of these cases involve murders in which an aggravating circumstance did not even arguably exist: State v. Howard, 377 So.2d 1226 (La.1979) (victim shot in bar several days after he had engaged in fight with two members of motorcycle gang to which defendant belonged); State v. Foote, 379 So.2d 1058 (La.1979), (doctor shot by younger brother suffering from emotional and mental disorders); State v. Gerstenschloger, 377 So.2d 130 (La.1979) (husband shot estranged wife after she refused to reconcile); State v. Allen, 367 So.2d 853 (La.1979) (defendant shoots man he sees out with his former girlfriend). In all of these cases, the defendants, when found guilty of first degree murder, were properly sentenced to life imprisonment.
In State v. Edwards, 375 So.2d 1365 (La. 1979) three teenage defendants broke into the home of a 78 year old woman, intending to take the keys to the victim's car in order to steal it. Once in the house, defendant Edwards took a knife from the kitchen, and then went out of his way to find the victim in the bathroom. Edwards then grabbed the victim and stabbed her numerous times. The three boys then ransacked the victim's house and stole her car. For his exploits *632 Edwards was sentenced to life imprisonment, following his conviction of first degree murder.
In State v. Collins, 378 So.2d 928 (La. 1979), defendant raped the victim, and then brutally killed her by means of a blow to the head which fractured her skull. Additionally, the victim's body showed numerous small wounds in the hairline area, a large abrasion on her right cheekbone, and cuts and abrasions over the remainder of her denuded body. Defendant was sentenced to life imprisonment.
A similar murder occurred in State v. Spooner, 368 So.2d 1086 (La.1979) in which the victim was kidnapped from the front of her apartment. The victim's nude body was later discovered in a drainage canal; she had been strangled with a bra which was still intertwined around her neck. Again defendant was sentenced to life imprisonment.
State v. Williams, No. 65,563 and State v. Holmes, No. 65,846, arose out of the same fact situation. On January 5, 1979, Robert Williams and Ralph Holmes entered a Baton Rouge A&P store with ski masks over their faces. Holmes went to one of the store counters to attempt to disarm a security guard. When this attempt failed and the guard reached for his gun, Williams shot him in the head with a shotgun, killing him instantly. The two then robbed the store and as they left, Williams allegedly dropped the shotgun, causing it to discharge and strike the manager and a customer. Holmes was sentenced to life imprisonment, but Williams was given the death sentence. The jury found as aggravating circumstances that Robert Williams was engaged in an armed robbery, in that he knowingly created a risk of death or great bodily harm to more than one person, and that the offense was committed in an especially heinous, atrocious or cruel manner.
From a review of the above cases, it becomes apparent that juries in East Baton Rouge Parish are reluctant to impose the death penalty. Edwards (aggravated burglary, atrocious manner), Collins (aggravated rape, atrocious manner), and Spooner (aggravated kidnapping and rape, atrocious manner) all involved circumstances more aggravated than those found in the instant case, yet the defendants in all of these cases received life imprisonment. State v. Williams was also far more aggravated than the instant case, particularly in light of the jury's express finding of three aggravating circumstances (armed robbery, risk of harm to several people, atrocious manner) and the finding of actual harm to several individuals.
The only apparent deviation from this line of cases is found in State v. Clark. Colin Clark was an employee of the Red Lobster Restaurant in Baton Rouge who quit his job the evening before the murder. After the restaurant had closed, Clark and a friend, Michael Glover, forced their way into the restaurant. When night manager Fred Schmidt came to the door, the two threatened him with a 6" knife and a .38 caliber pistol. Schmidt was forced to open the safe and give defendants its contents. Glover left to place the money in their car, and when he returned, Clark and Schmidt were fighting, with Clark stabbing Schmidt repeatedly. When Clark subsequently cut his own hand, he became angry, grabbed the gun from Glover, and shot Schmidt in the head. Glover was sentenced to life imprisonment, but the jury recommended that Clark be put to death. The jury found as an aggravating circumstance that the murder was committed during the course of an armed robbery.
Despite the apparent similarity of the Clark case to that of defendant herein (armed robbery as aggravating circumstance; defendant with no significant prior record), it appears clear that there was adequate evidence in the Clark case on which to base finding of additional aggravating circumstances of aggravated burglary and committing the murder in an especially atrocious manner. In any event, neither Clark nor Williams have yet been reviewed by this Court.
The overwhelming majority of first degree murder cases in east Baton Rouge *633 Parish have resulted in sentences to the defendant of life imprisonment. Since many of these cases present factual circumstances far more heinous than those presented herein, it seems clear that punishment disproportionate to that imposed in similar cases will result by the execution of James C. Williams.
The judgment convicting the defendant of first degree murder and sentencing him to death should be reversed, and the cause remanded for retrial on the issues of guilt and penalty.

ON REHEARING
DENNIS, Justice.
A rehearing was granted to reconsider defendant's assignments of error number three (exclusion of the testimony of three defense witnesses as a sanction for defendant's failure to make pre-trial disclosure of their names as alibi witnesses) and numbers six and seven (failure to instruct the jurors that, if they were unable to agree unanimously upon a recommendation, the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence).

1.
For the reasons assigned in the majority opinion upon original hearing, we conclude that defendant's assignment of error number three is without merit.

2.
In assignments of error numbers six and seven defendant contends that the trial court erred when, during the penalty stage of the trial, it failed to inform the jurors that, if they were unable to agree unanimously upon a recommendation, the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. We conclude that these assignments are meritorious and that the defendant's sentence must be reversed and the case remanded for a new trial. In giving jury instructions during the penalty stage of the trial, the trial judge was obliged to inform the jurors fully as to the consequences of their penalty recommendation; where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed so as to minimize the risk of arbitrary and capricious action.
Following a verdict of guilty, a sentencing hearing was conducted before the same jury that determined the issue of guilt. The prosecution, in asking for the death penalty, relied on the evidence offered at the trial on the issue of guilt, and the testimony of the victim's widow who described her deceased husband as a helpless, partial paralytic. The defendant testified to the jury protesting his innocence again and asking the jurors to impose the death sentence if they did not believe him. The jury was informed that the defendant, who was thirty-seven years old, had a criminal record consisting of one felony, a simple burglary in 1973, and several misdemeanors.
The jurors retired after hearing the evidence of aggravating and mitigating circumstances and being given instructions by the judge. Following a period of deliberation of approximately three hours the jury returned to the courtroom where a colloquy occurred between the trial judge and the jury foreman.[1] In essence, the jury foreman *634 asked if the jury's recommendation had to be unanimous. The trial judge informed the jury that its "recommendation, whatever, as to the two, either death or life imprisonment without benefitmust be unanimous. Must." The foreman responded that, at that time, the jury could not reach a decision. However, when the judge inquired if further deliberation would be useful and indicated the jury could be brought back the next day after being given food and rest in sequestration, the foreman requested leave for the jury to deliberate for another thirty to forty minutes. After an additional period of deliberation lasting forty-five minutes, the jury returned and unanimously recommended that the defendant be sentenced to death, assigning the armed robbery as an aggravating circumstance. This occurred at the end of a seven-day trial on the issue of guilt and a one-day sentencing hearing.
The trial judge did not inform the jury either in his general or additional instructions that its inability unanimously to agree on a recommendation would require the court to impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. The issue presented is whether the jurors in a capital sentence hearing must be informed by the trial judge that the defendant will be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence, if they are unable to be unanimous on a recommendation.
The constitutional prohibition against cruel, unusual or excessive punishment mandates that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). See also, Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 345 (1972). The death penalty may not be imposed under sentencing procedures that create a substantial risk that it will be inflicted in an arbitrary and capricious manner. Gregg v. Georgia, supra, 428 U.S. at 153, 96 S.Ct. at 2909, 49 L.Ed.2d at 859. Moreover, in a case in which the penalty is determined by the jury rather than by the judge, the jurors, in order to perform their function as a rational "link between contemporary community values and the penal system," Witherspoon v. Illinois, 391 U.S. 510 at 419 n. 15, 88 S.Ct. 1770 at 1775 n. 15, 20 L.Ed.2d 776 (1968), must be fully informed of the consequences of their verdicts, including the penalties involved. State v. Washington, 367 So.2d 4 (La.1978); State v. Milby, 345 So.2d 18 (La.1977); see State v. Prater, 337 So.2d 1107, 1109, 1110 (La.1976) (Tate, J., concurring) (Calogero, J., dissenting).
In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. They were not told that, by their failure to decide unanimously, they would in fact decide that the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. Instead, the members of the sentencing body were left free to speculate as to what the outcome would be in the event there was not unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required.
Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings. Consequently, by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the *635 risk of arbitrary and capricious action. The death penalty was imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.
The penalty of death is qualitatively different from a sentence of imprisonment. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Gardner v. Florida, 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (White, J., concurring); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
The effect of the error here involved must be held to have been prejudicial. If only one of the twelve jurors was swayed by the failure to inform him fully of the consequence of his sentence recommendation, then, in the absence of that error, the death penalty would not have been imposed.
The judgment convicting the defendant of first degree murder is affirmed. His sentence of death is reversed, and the cause is remanded for a retrial on the issue of penalty.
CONVICTION AFFIRMED; SENTENCE REVERSED; REMANDED.
LEMMON, J., concurs and will assign reasons.
MARCUS and WATSON, JJ., concur in the affirmance of the conviction but dissent from reversal of the sentence.
BLANCHE, J., concurs in the affirmance of the conviction and dissents from the reversal of the sentence and will hand down reasons therefor.

ON REHEARING
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully concur in the reversal of the defendant's sentence, and I respectfully dissent from the majority opinion's affirmance of the defendant's conviction.
Defendant, in his assignment of error number three, contended that the trial court erred when it excluded the testimony of three defense witnesses as a sanction for defendant's failure to make pre-trial disclosure of their names as alibi witnesses. In my opinion the trial court committed reversible error in this instance because pretrial notice to the prosecution of the defendant's intention to call the witnesses was not required; their testimony was not offered to establish defendant's absence from the scene of the crime at the time of its commission.
On August 3, 1977, at approximately 12:45 a. m., a man armed with a pistol approached Elmo Plain, the attendant of the Stadium Exxon station in Baton Rouge, and demanded the money in his hand. When Plain refused and started to walk toward a customer at the gasoline pumps, the robber shot Plain, seized the money and fled. Plain died within minutes of a single gunshot wound. James Williams was arrested the next day and positively identified at a lineup as the assailant by three eyewitnesses.
The prosecution's eyewitnesses identified Williams as the murderer at trial. However, neither the murder weapon nor the money was recovered or introduced at trial. Williams testified to the jury that he was not the killer. He maintained that on the night of the offense he left his mother's house at about 11:30 p. m. and went to Shelby's Bar and Lounge where he remained until nearly 2:00 a. m.
Pursuant to La.C.Cr.P. art. 727 the prosecution served Williams before trial with a written demand for notice of his intent to assert an alibi defense, stating that "the crime occurred after 12:00 a. m., August 3, 1977 at Stadium Exxon, 1300 Scenic Highway." Williams responded that at the time of the crime he was in Shelby's Bar and Lounge, 1752 North Acadian Thruway, Baton Rouge, giving the names or place of *636 employment of four alibi witnesses: the bar owner, two barmaids and Williams' common-law wife.
Following a prosecution objection at trial, the trial court excluded the testimony of three defense witnesses on the ground that they were alibi witnesses whose identity had not been disclosed in response to the state's demand. The defense attorney argued that the witnesses, all relatives of the defendant, were not within the ambit of the alibi disclosure rules. Because the crime occurred over thirty minutes after they had last seen defendant at 11:30 p. m. at his mother's house three blocks from the Stadium Exxon, he contended that their testimony could not establish an alibi. The prosecuting attorney did not withdraw his objection but seemed to agree that testimony pertaining to Williams' presence at his mother's house before 11:30 p. m. did not tend to establish alibi. Nevertheless, the trial judge adhered to his ruling stating that he would exclude testimony from any undisclosed witness which "points in the direction of alibi." The defense attorney objected timely and assigned the trial judge's ruling as error.
Article 727 of the Code of Criminal Procedure is identical to Rule 12.1 of the Federal Rules of Criminal Procedure.[1] Section A of the article requires a defendant to disclose, upon receipt of a written prosecution request, whether he intends to offer an alibi defense, the place where he claims to have been at the time the alleged offense was committed, and the names and addresses of the witnesses upon whom he intends to rely in attempting to establish his alibi. Section B requires reciprocal disclosure of witnesses uncovered by the prosecution who will refute the alibi and Section C makes the duty to disclose a continuing obligation for both parties. Section E authorizes the trial court to excuse a party from compliance with the disclosure requirements upon a showing of good cause, and Section D empowers him to penalize unexcused noncompliance by excluding the testimony of undisclosed witnesses, except the defendant himself, offered by either party as to the defendant's absence from or presence at, the scene of the alleged offense.
The issue presented here is whether a witness whose testimony does not tend to establish the defendant's absence from the scene of the alleged offense, but whose testimony is otherwise consistent with the defendant's alibi defense, must be disclosed by the defendant in response to the prosecution's *637 written demand for notice of alibi. Fundamentally, we must decide if the rule authorizing a preclusion of testimony for failure to disclose defense alibi witnesses is to be strictly or broadly construed.
If permissible at all, the rule authorizing the trial judge to invoke the sanction of Louisiana Code of Criminal Procedure article 727(D) must be construed strictly in order not to impinge on a defendant's constitutional rights to compel the attendance of witnesses and to present a defense. The Sixth Amendment's guarantee that "the accused shall enjoy the right to ... have compulsory process for obtaining witnesses in his favor" includes "[t]he right to offer the testimony of witnesses ... the right to present a defense, the right to present the defendant's version of the facts ...." Washinton v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Article 1, § 16 of the 1974 Louisiana Constitution expressly provides that "[a]n accused is entitled... to compel the attendance of witnesses, to present a defense ...." Whether and to what extent a state can "enforce discovery rules against a defendant who fails to comply, by excluding relevant, probative evidence" has been expressly recognized and left open by the Supreme Court as a question raising Sixth Amendment issues. Wardius v. Oregon, 412 U.S. 470, 472, n. 4, 93 S.Ct. 2208, 2211, n. 4, 37 L.Ed.2d 82 (1973); Williams v. Florida, 399 U.S. 78, 83, n. 13, 90 S.Ct. 1893, 1893, n. 13, 26 L.Ed.2d 446 (1970).
While the Supreme Court has not decided the propriety of excluding a defendant's evidence because of non-compliance with criminal discovery rules, it has held, in three well known cases that a state may not enforce other types of statutory rules which infringe upon a defendant's Sixth Amendment rights. A rule prohibiting principals, accomplices, or accessories to the crime from being defense witnesses has been held unconstitutional when balanced against the defendant's right to present his defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). A voucher rule and a rule against admitting hearsay testimony may not be applied so as to deprive a defendant of his right to present a defense guaranteed by the Sixth Amendment. Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1083, 35 L.Ed.2d 297 (1973). A state's juvenile records privilege statute must yield to a defendant's right to present a defense when it is necessary to inquire into the records to discover a prosecution witnesses's possible bias. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). See also, United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).
Accordingly, there is ample ground for argument that a preclusion of a criminal defense witness's testimony to enforce discovery rules is contrary to both the Sixth Amendment and Article 1, § 16 of the 1974 Louisiana Constitution. See also, Pugh and McClelland, Work of the Louisiana Appellate Courts, 1973-74 Term, Evidence, 35 La.L.Rev. 544 (1975); Clinton, The Right to Present a Defense: An Emergent Constitutional Guarantee in Criminal Trials, 9 Ind.L. Rev. 711 (1976); Western, The Compulsory Process Clause, 73 Mich.L.Rev. 71 (1974). As the Supreme Court in Wardius v. Oregon, supra and Williams v. Florida, supra, we may set to one side, without deciding, this constitutional issue as being unnecessary to resolve the question presented in the present case. The tension and possible conflict between the preclusion device and a defendant's right to present a defense are plainly evident, however, and require that the sanction be construed narrowly and used sparingly.
When Louisiana Code of Criminal Procedure article 727(D) is construed strictly and applied to the situation presented by this case one must conclude that the trial judge erred in excluding the testimony of the defense witnesses as undisclosed alibi evidence. The statute required the defendant, upon giving notice of an alibi defense, to state "the names and addresses of the witnesses upon whom he intends to rely to establish such alibi." La.C.Cr.P. art. 727(A). If the defendant had failed to comply, the trial judge was authorized to "exclude the testimony of any undisclosed witness *638 offered by [defendant] as to the defendant's absence from ... the scene of the crime." La.C.Cr.P. art. 727(D). The precluded testimony of the three defense witnesses clearly would not have tended to establish an alibi or to prove the defendant's absence from the scene of the crime. On the contrary, the testimony of these witnesses, insofar as the location of the defendant at the time of the offense, was no more probative of the defendant's alibi than it was of the prosecution's case.
The preclusion of testimony by the defendant's witnesses was unwarranted and denied him his rights to offer testimony and to present a defense.
DIXON, C. J., joins DENNIS, J., in his concurring and dissenting opinion.
LEMMON, Justice, concurring.
I concur in the decree affirming the conviction, but for different reasons than those stated in the majority opinion on original hearing. I also concur in the decree reversing the sentence and remanding for a retrial on the issue of penalty, but for different reasons than those stated in the prevailing plurality opinion on rehearing.
Guilt Phase of the Trial.
Prior to the trial the prosecution, pursuant to C.Cr.P. art. 727, served upon the defense counsel a written demand for notice of intention to offer a defense of alibi, stating the murder had occurred at the Stadium Exxon Station after midnight on the morning of August 3, 1977. In response defendant stated he was at Shelby's Bar at the time of the crime and listed as alibi witnesses the owner of the bar, two barmaids, and Roselie Price, the woman he was living with at the time.
The trial began on Monday, October 23, 1978. On Saturday, October 28, 1978 (the sixth day of trial and the third day of testimony), after the prosecution had rested its case, defense counsel called Houston Williams as a defense witness. When counsel began questioning the witness as to the events of the night of the murder, the prosecution objected in advance to any alibi testimony this witness might give, since he was not listed as an alibi witness in defendant's response to the prosecution's discovery motion.
After the jury was removed, defendant's principal counsel (who had entered the case six days before trial) explained that he had only learned the day before the trial began that Houston Williams, Bucky Williams, and Beverly Williams were with defendant at his mother's house on the night of the murder. When counsel stated he intended to establish by these three witnesses that defendant left there on foot at 11:30 p. m., the prosecution conceded such testimony was not truly alibi evidence, inasmuch as the mother's house was only four blocks from the scene of the murder which occurred about 12:45 the next morning, one hour and 15 minutes after the time of defendant's departure.[1]
Defense counsel then stated that he also intended to call one additional witness to testify that defendant called her at 12:15 a. m. at Roselie Price's home, stating he was at Shelby's Bar and requesting that Roselie call him there when she returned home. The prosecution objected to that alibi testimony because of the failure to provide the required ten-day notice, noting no notice was filed even during the six days of trial. Believing the prosecution would be unduly prejudiced by such evidence which was known to defendant's principal counsel for seven days and which was apparently known to co-counsel for many months, the trial judge decided not to allow the testimony (which defense counsel admits was alibi evidence).[2]
*639 Defense counsel then inquired as to what specific evidence was being excluded, and the trial judge stated his intention to limit "alibi testimony or anything that points in the direction of alibi" to testimony by those witnesses listed in defendant's response filed in the record.
When the jury returned, defense counsel attempted to question Houston Williams on the events of the night of the murder. The prosecution objected, and the court sustained the objection. Counsel then proceeded to ask the witness other questions, but did not call the other two prospective witnesses.
In arguing at trial on the disputed ruling, defense counsel stated his purpose in presenting these three witnesses was to show defendant left his mother's house at 11:30 p. m. and had been drinking. Defendant established these facts, however, by his own and other uncontradicted testimony, and in fact he asserted strongly that he was not intoxicated.
In my opinion the trial court erred in characterizing testimony on those facts as alibi evidence excludable by C.Cr.P. art. 727(D). Nevertheless, defendant does not show that erroneous ruling excluded any relevant and probative evidence, particularly since the judge clearly did not preclude these three witnesses from testifying as to any other facts.
On appeal defendant counsel argues he could have used these three witnesses to establish the clothing defendant was wearing that evening did not match the murderer's clothing described by the eyewitnesses. However, the trial judge's ruling did not prohibit counsel's use of these witnesses for the purpose of rebutting the prosecution's identification evidence, and counsel's argument on appeal appears merely to be an afterthought. In any event counsel did not ask Houston Williams questions about defendant's dress, did not call Bucky Williams and Beverly Williams at all, and questioned Mildred Price (who was also not listed) without limitation. The record does not indicate any reason to presume the judge either knew counsel wanted to ask Houston Williams any questions about defendant's dress or would have excluded such questions if asked. Moreover, two other defense witnesses were permitted, after the trial judge's disputed ruling, to describe defendant's dress that evening, and the jury apparently chose to discredit them and to credit instead the story of four of the five eyewitnesses who identified defendant as the murderer.[3]
In my opinion the trial court erred in broadly (instead of narrowly) interpreting what testimony from undisclosed witnesses is excludable under C.Cr.P. art. 727(D), but any error in this ruling did not prejudice defendant's presentation of his case or impinge upon his constitutional right to present witnesses in his defense.[4]
Penalty Phase of the Trial.
The facts of this case present only the issue of whether a trial judge, when *640 questioned as to the necessity of a unanimous verdict after the jury has deliberated for three hours and has announced it cannot reach a verdict, errs by reiterating the absolute necessity for unanimity rather than informing the jury of the consequences of a non-unanimous verdict. Under these circumstances I believe the trial judge erred by failing to minimize the risk of arbitrary action.
The legislative scheme for sentencing in capital cases attempts to require assiduous deliberation by the jury in an effort to secure unanimity on a recommendation, while providing a solution in the event of a "hung jury"life imprisonment imposed by law, rather than a retrial of the sentencing phase before a subsequently empaneled jury. Nevertheless, there is a seeming inconsistency in C.Cr.P. arts. 905.6 and 905.8, since those articles, when considered together, appear to require jury unanimity to recommend a life sentence while at the same time providing for a life sentence in the event of failure to reach unanimity.
Arguably, a pre-deliberation jury instruction, pointing out that twelve jurors must concur to impose a death penalty while only one juror can effectively decide the sentence is to be life imprisonment, would be inconsistent with the legislative scheme, which requires the jury to seek to achieve unanimity in order to recommend a sentence. Perhaps the legislative requirement of jury unanimity for recommendation of either verdict is designed to insure the prosecution a fair opportunity to obtain a recommendation of the death penalty in an appropriate case.
That precise problem is not presented in this case, however, since the jury did deliberate for three hours on the question of penalty in an attempt to achieve unanimity before asking for further instructions on the necessity of unanimity. When informed that a unanimous verdict was required either way, the foreman announced that the jury was deadlocked.
At that point any legislative right of the prosecution to have the jury make a substantial effort for a unanimous verdict had been adequately protected. Advice as to the ultimate consequence of non-unanimity could then have been revealed without undue prejudice to the prosecution, and such advice would then have been consistent with the statutory scheme. More importantly, failure to inform the jury of the consequences of non-unanimity at that time could have unduly pressured a minority juror to acquiesce in a death penalty recommendation merely to reach the required unanimity, whereas furnishing the information could have assured a minority juror that he need not abandon his honest conviction for the sake of returning a verdict.
This is a particularly sensitive problem because of the irreversible nature of the death penalty. However, at least after an attempt has been made to achieve unanimity, the jury should be entitled not to have to speculate that non-unanimity would cause defendant to be retried, either entirely or as to penalty only. Disclosure of full information to the jury, at least after a significant attempt to achieve unanimity, accomplishes the legislative purpose, accommodates the legitimate competing interests of both sides, and minimizes the risk of arbitrary action.
In this case the trial court erred in failing to inform the jury of the consequences of non-unanimity when asked to do so after a substantial attempt by the jury to achieve unanimity. The reiteration that the recommendation, either way, must be unanimous, closely approached the effect of a "dynamite" charge under these particular circumstances.
NOTES
[1] The trial judge had originally excluded Miss Price's testimony. However, she was later allowed to testify without objection.
[2] It should be noted that another provision of C.Cr.P. art. 727 provides for a continuing obligation to disclose newly discovered witnesses as follows: "C. If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under Subsection A or B, the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness."
[3] The defendant's allegation of error is raised for the first time on appeal. There is nothing in the record showing an objection at trial to the instruction given or a request that a contrary instruction be given. This Court has consistently held that the failure to object to an alleged irregularity at the time of the occurrence precludes the defendant from availing himself of any such irregularity after the verdict. State v. Knight, 323 So.2d 765 (La.1975); State v. Lee, 343 So.2d 1060 (La.1978). Although this would be dispositive of the issue, we prefer to reach the merits of the defendant's claim.
[4] Although both Michael Glover and Ralph Holmes, Jr. were convicted of first degree murder, they weren's sentenced to death. However, both were merely principals in their respective crimes with Colin Clark and Robert Williams.
[5] State v. Collins, 378 So.2d 928 (La.1979); State v. Allen, 380 So.2d 28 (La.1980); State v. Foote, 379 So.2d 1058 (La.1980); State v. Norman Spooner, 368 So.2d 1086 (La.1979).
[6] State v. Edwards, 375 So.2d 1365 (La.1979); State v. Howard, 377 So.2d 1226, (La.1979); State v. Glover, 381 So.2d 832, No. 66,000 (La. 1980); State v. Holmes, No. 65,846, appeal pending.
[1] La.C.Cr.P. art. 727 provides:

"A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
"B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.
"C. If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under Subsection A or B, the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.
"D. Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.
"E. For good cause shown, the court may grant an exception to any of the requirements of Subsections A through D of this Section.
"F. Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention."
For discussion of its source, Federal Rule of Criminal Procedure article 12.1, see 8 Moore's Federal Practice, ch. 12.1 (1979); 1 Wright's Federal Practice and Procedure §§ 201-203 (Supp.1978).
[2] THE COURT: Mr. Baptiste, what's the pleasure of the jury?

MR. BAPTISTE: Your Honor, we would like to know if it has to be a unanimous verdict?
THE COURT: That was the Court's instructions. Your recommendation, whatever, as to the two, either death or life imprisonment without benefitmust be unanimous. Must.
MR. BAPTISTE: At this time Your Honor, we feel we cannot reach a decision.
THE COURT: Is the jury fixed in that opinion?
MR. BAPTISTE: Yes Sir.
THE COURT: You're better situated to feel the pulse of the jury than I am because you're in there with them, Mr. Baptiste. But, I nevertheless will inquire, whether or not you feel any useful purpose whatsoever would be gained by further thought and deliberations, even to the point of where I can recess your deliberations, I can provide for your welfare, rest and food and bring you back tomorrow.
MR. BAPTISTE: Could we deliberate say another thirty or forty minutes?
THE COURT: Why, of course, absolutely. You know what I told you about your patience during the presentment of this case. Ya'll didn't call time on us. I don't call time on your deliberations, no way. Please retire, discuss it among yourselves and let me know what you want to do.
[1] THE COURT: Mr. Baptiste, what's the pleasure of the jury?

MR. BAPTISTE: Your Honor, we would like to know if it has to be a unanimous verdict?
THE COURT: That was the Court's instructions. Your recommendation, whatever, as to the two, either death or life imprisonment without benefitmust be unanimous. Must.
MR. BAPTISTE: At this time Your Honor, we feel we cannot reach a decision.
THE COURT: Is the jury fixed in that opinion?
MR. BAPTISTE: Yes sir.
THE COURT: You're better situated to feel the pulse of the jury than I am because you're in there with them, Mr. Baptiste. But, I nevertheless will inquire, whether or not you feel any useful purpose whatsoever would be gained by further thought and deliberations, even to the point of where I can recess your deliberations, I can provide for your welfare, rest and food and bring you back tomorrow.
MR. BAPTISTE: Could we deliberate say another thirty or forty minutes?
THE COURT: Why, of course, absolutely. You know what I told you about your patience during the presentment of this case. Ya'll didn't call time on us. I don't call time on your deliberations, no way. Please retire, discuss it among yourselves and let me know what you want to do.
[1] La.C.Cr.P. art. 727 provides:

"A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
"B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.
"C. If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under Subsection A or B, the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.
"D. Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.
"E. For good cause shown, the court may grant an exception to any of the requirements of Subsections A through D of this Section.
"F. Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention."
For discussion of its source, Federal Rule of Criminal Procedure article 12.1, see 8 Moore's Federal Practice, ch. 12.1 (1979); 1 Wright's Federal Practice and Procedure §§ 201-203 (Supp.1978).
[1] Alibi is defined to mean that defendant, at the time of the crime, was at a place so distant or under such circumstances that he could not have committed the crime. Black's Law Dictionary (Rev. 4th Ed. 1968).
[2] This witness, Mildred Price, was Roselie Price's daughter-in-law. Mildred Price did later testify, without objection, that she was at Roselie's house on the night of the murder and that defendant called there three times that night, the last time at 12:10 a. m.
[3] One of the eyewitnesses had known defendant all her life and was under the impression at the time of the line-up identification that defendant was her mother's godchild. Another eyewitness was the victim's 14-year-old son who had seen defendant at the station several times previously with a "fat woman" in an old white Ford. (Roselie Price admitted she owned a 1968 white Ford and bought gas at that station on occasions.) Two other eyewitnesses identified defendant as the murderer, but were less positive. The fifth eyewitness, Roselie Price's son, was the first to inform police defendant was the murderer, but denied this at trial.

Furthermore, defendant's key alibi witness did not corroborate the significant details of his alibi. The owner of Shelby's Bar testified he didn't know if defendant was there the night of the murder, and the only barmaid on duty testified defendant got there at 1:45 a. m.
[4] I disagree with the conclusion of the majority opinion on original hearing that the trial judge properly excluded evidence by the three witnesses of defendant's dress, drinking, and time of departure on the night of the murder as alibi evidence by undisclosed witness. While the effect of evidence rebutting the prosecution's identification by eyewitnesses is to show defendant was not at the scene of the crime at the pertinent time, such evidence is not truly alibi evidence, the essence of which is proof that the defendant was at another place at the pertinent time.