474 So.2d 919 (1985)
STATE of Louisiana
v.
Andrew Lee JONES.
No. 85-KA-0005.
Supreme Court of Louisiana.
June 20, 1985.
Rehearing Denied September 9, 1985.
*922 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Bryan Bush, Dist. Atty., Kay Kirkpatrick, Jessee Bankston, Asst. Dist. Attys., for plaintiff-appellee.
Alton T. Moran, Director, David Price, Asst. Public Defender, Baton Rouge, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. The principal issues involve (1) the constitutionality of the 1983 amendment to La.C.Cr.P. Art. 799 which reduced the number of peremptory challenges from twelve to eight; (2) the denial of a challenge for cause of a prospective juror from the victim's neighborhood who visited the funeral home to view the victim's body; (3) the granting of challenges for cause for eight prospective jurors who opposed capital punishment; (4) the admission of inculpatory statements not revealed in responses to discovery; (5) the admission of conflicting statements by defendant for the purpose of depicting defendant to the jury as a liar; (6) the prosecutor's reference to appellate review in closing arguments in the penalty phase; and (7) the denial of requested jury instructions in the sentencing phase.[1]
After considering every assignment of error, including those abandoned or not argued on appeal, and after making an independent review of the record, we affirm the conviction and sentence.

FACTS
On February 17, 1984, eleven-year old Tumekica Jackson was living with her mother and her grandparents in the Scotlandville section of Baton Rouge. At 4:00 a.m., the grandmother discovered that the child was missing from her bedroom.
The police discovered that someone had broken the screen of the rear den window and had opened the back door. In the muddy ground near the house, police obtained a cast of an imprint made by the left shoe from a pair of size 8½ tennis shoes. There were no signs of a struggle inside the house.
*923 The investigation immediately focused on defendant because his stormy romantic relationship of several years with the victim's mother had been broken off by her the week before. The victim knew defendant well, and he had been in the home many times. On the evening of the child's disappearance, defendant had called the mother's home three times and had told the grandmother that he would not be responsible for his actions if the mother continued to refuse to see him.
About 6:30 a.m., the police went to the apartment where defendant lived with his sister, Terry Jones, and his half brother, Abraham Mingo. Defendant told the police he had been home all night, and Mingo and Miss Jones confirmed his story.
A few hours later, Miss Jones called the police and said she may have been "mistaken" about defendant's being home all night. After questioning her further, the police obtained a written consent to search the apartment about 10:00 a.m. When no one answered the officer's knock, Miss Jones used her key to open the door. Officers found defendant in the bathroom washing a pair of size 8½ tennis shoes. The bath tub was full of dirt and leaves. The officers seized the tennis shoes and a pair of green gloves, and they requested that defendant give them a statement at the station. After signing a waiver, defendant gave the police a tape-recorded statement in which he denied any knowledge of the offense. He was then allowed to leave with his sister.
At approximately 6:00 p.m., Tumekica's partially nude body was found in a drainage canal. An autopsy established that the child had been beaten, raped and manually strangled.
The police again questioned Abraham Mingo. Although he initially told conflicting stories, he eventually gave a detailed account of his activities with defendant on Friday night and Saturday morning. According to Mingo, he and his sister (Terry Jones) were out with defendant on Friday evening, but dropped him off in Scotlandville. About 12:30 a.m. on Saturday morning, defendant returned to the apartment. Donald Nixon was with defendant, but he stayed only a short time. About 1:00 a.m., Mingo and defendant went to the Snowflake Lounge, but defendant left alone about 30 minutes later, and Mingo returned to the apartment. At some point between 4:30 and 5:00 a.m., Mingo was awakened by defendant's knock on the door, whereupon he let defendant in and went back to bed. When Mingo and defendant were alone in the apartment later that morning, defendant told him that "he shoulda stayed home", that "he did something he didn't want to do", and that he "done fucked up". Defendant gave Mingo a TG & Y bag and asked him to throw it away, which he did without looking inside.
At Mingo's direction, police recovered a TG & Y bag from a dumpster near a grocery store. The bag contained socks, a pair of blue jeans and a pink sweatshirt, which were wet, muddy and stained. Later analysis identified the stains as a mixture of blood and seminal fluid.
Mingo also told the police about a pair of boxer shorts that he had found in the bathroom of the apartment. The shorts belonged to Mingo, but (according to Mingo) defendant had worn them on Friday night. Pursuant to Mingo's written consent, the police recovered a pair of stained brown and white boxer shorts from the trunk of Mingo's car. Analysis confirmed the presence of blood and seminal fluid on the boxer shorts.
On the basis of this information, police obtained a warrant and arrested defendant on Sunday. After advise and waiver of his rights, defendant gave a video-taped statement, in which he asserted that he and Rudolph Springer had gone to the victim's house early Saturday morning to commit a burglary. Fearful of being recognized, defendant remained in the car while Springer entered the house. When Springer returned carrying Tumekica, defendant got in the back seat and pulled his cap over his face. After a few minutes, Springer drove defendant to his apartment at his request. *924 That was the last time that defendant saw Tumekica Jackson.
At trial, Abraham Mingo, Terry Jones and Rudolph Springer testified for the state. Having been granted immunity, Mingo testified about defendant's statements and his request to dispose of the TG & Y bag. Springer denied any knowledge of the crime, and he and two corroborating witnesses established his alibi for the pertinent times. Another witness, Reginald Jackson, testified that on the night of the murder defendant asked him for a ride to Scotlandville to look for the victim's mother. He identified the tennis shoes, blue jeans and pink sweatshirt as the clothes worn by defendant that night.
The state also introduced the tennis shoes seized from defendant's apartment. A forensic scientist testified that these were the same size and tread design as the one which left the impression at the victim's house, but he could not make a positive identification because of the poor quality of the soil and the resultant poor quality of the cast. He did state that there were no dissimilarities.
A serologist established that the blood on the victim's underwear and pajama bottoms, as well as that on defendant's boxer shorts and the blue jeans, came from the victim. The seminal fluid found on these articles of clothing came from an individual with Type O blood, the same type as defendant's.
Defendant did not take the stand, and the defense presented no evidence. The jury unanimously found defendant guilty as charged of first degree murder.
In the sentencing hearing, the state reintroduced all evidence adduced at trial. The defense presented the testimony of defendant's mother, four of his sisters and a cousin. The jury, finding two statutory aggravating circumstances, unanimously recommended the sentence of death.

GUILT PHASE
The evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of the specifically intended killing of a human being when he was engaged in the perpetration of an aggravated rape. La.R.S. 14:30(1); Jackson v. Virginia 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Defendant called the victim's home and told her grandmother that he would not be responsible for his actions. He admitted being present at the kidnapping (after denying knowledge of the crime). His muddy tennis shoes and his wet clothes stained with blood and seminal fluid connected him with the victim, whom the autopsy showed had been raped and strangled. He gave the clothes to Mingo to be discarded and told him he had done something he didn't want to do. This evidence was clearly sufficient to support the conviction.
Constitutionality of Reduction in Number of Peremptory Challenges (Assignment of Error No. 5)
Defendant argues that Acts 1983, No. 495, which amended La.C.Cr.P. Art. 799 to reduce the number of peremptory challenges from twelve to eight in trials of offenses punishable by death or necessarily by imprisonment at hard labor, violates La. Const. Art. I § 17 (1974).[2] Defendant also complains of the denial of his motion for additional peremptory challenges.
*925 The Louisiana Constitution guarantees the right to "full voir dire examination" and the right "to challenge jurors peremptorily".[3] Significantly, the Constitution left to the Legislature the fixing of the number of peremptory challenges.
During the jury selection, the defense is permitted to question all prospective jurors and to challenge for cause those jurors who are biased against the rights accorded to an accused and who will not give the accused a fair trial. Peremptory challenges are used to exclude those jurors who will give the accused a fair trial, but whose philosophy or background make them the least desirable (in defense counsel's perception) of the jurors who are not excused for cause. Since these challenges are permitted without cause, without explanation and without judicial scrutiny, efficient trial procedures dictate that the number of such challenges be limited.
While there is general agreement as to the value of peremptory challenges, there is little agreement as to the appropriate number which balances the problems of summoning a large number of veniremen and of a protracted selection process against the value of the right to exclude jurors for reasons which do not rise to the level of a challenge for cause.[4] Many years ago, A.L.I. Code of Criminal Procedure § 282 (1930) recommended ten peremptory challenges in a capital case. At that time, the number provided by state statutes varied from four to thirty. A more recent survey indicated few changes, with no noticeable trend toward increasing or decreasing the number. See A.B.A. Standards Relating to Trial by Jury, Ch. 15, § 2.6 (1980). Arizona, Colorado, Florida, Idaho, Oklahoma and South Carolina permit fewer than twelve challenges in capital cases. In the federal system, twenty challenges are permitted in capital cases, although the Supreme Court recommended a reduction to twelve in 1977. Fed.R.Crim.P. 24(b); Pub.L. 95-78, § 2(c), 91 Stat. 320 (1977).
Arguably, the number of peremptory challenges may be reduced to a point too low to ensure "full voir dire examination". Perhaps also capital cases should reflect special considerations desirable to ensure fairness when the accused is exposed to the most severe penalty.[5] However, we cannot conclude that the legislative reduction of peremptory challenges to eight effectively deprives defendant of his constitutional right to full voir dire examination or to challenge jurors peremptorily, nor can we conclude that the reduction threatens the preservation of any other constitutional guarantees relating to the right of trial by jury. Challenge for Cause (Assignment of Error No. 10)
Defendant contends that the trial court erred in denying his challenge for cause for prospective juror Martha Pate.[6] Defendant argues that the juror could not be impartial because she had previously worked in law enforcement, had also worked for a state witness, and had gone to the funeral home to view the victim's body after the murder.[7]
*926 Mrs. Pate had worked as a corrections officer at Angola Penitentiary for eighteen months, leaving that employment in 1978. Her husband also worked there during that time. While performing her duties as a tower guard, she was always armed and had drawn her weapon once during an abortive escape attempt.[8] Mrs. Pate had also worked as a clerk in a hospital laboratory supervised by the doctor who was to be called as a witness in connection with the autopsy results. Additionally, although Mrs. Pate did not know the victim or her family personally, she lived eight to ten blocks away and had seen the victim playing with two other neighborhood children near a bus stop. When Mrs. Pate observed that one of the children was missing from the group about the time of the murder, she made the connection between the victim's reported address in the neighborhood and the missing child in that age range. Curiosity led Mrs. Pate and some other social workers to visit the funeral home "to see if this was the little girl that was missing". Nonetheless, Mrs. Pate asserted that this impersonal interest in the victim would not affect her fairness in deciding the case.
Mrs. Pate believed strongly in capital punishment. However, she stated she "would have to be thoroughly convinced" before voting to recommend the death penalty. She also acknowledged the fact that a verdict of guilty would not mean the automatic imposition of the death penalty, and she assured the court that her decision would be based on the evidence. She indicated that if "the other alternative (life imprisonment) fits better", that would be her recommendation.
La.C.Cr.P. Art. 797 provides that either side may challenge a prospective juror for cause because the juror lacks impartiality or because a relationship between the victim and the juror could reasonably influence the juror in arriving at a verdict. Article 797(3) lists such relationships as those arising from "blood, marriage, employment, friendship, or enmity".
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Smith, 430 So.2d 31 (La.1983). A trial court is accorded great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Smith, 437 So.2d 802, (La.1983).
Previous associations with either law enforcement agencies or personnel will not alone disqualify a prospective juror from service. State v. Lewis, 391 So.2d 1156 (La.1980). Nevertheless, such associations should be closely scrutinized by the trial court and the reviewing court.
In State v. Chapman, 410 So.2d 689 (La.1982), a sixty-one year-old prospective juror had been warden of the parish jail for twenty years and had been retired for four or five years. He knew the defense attorneys, but not the defendant or the prosecutors. He had not heard of the case, and he stated a belief in the presumption of innocence, said he understood the burden of proof and reasonable doubt, and promised to withhold an opinion until deliberations. This court affirmed the denial of challenge for cause, stating on rehearing:
"Except for an assumption that the jailer for many years would know personally, and be on a friendly relationship with most law enforcement officers, there is nothing in the record, nor in the nature of the position as jailer of a parish jail known generally, which would, by that fact alone, disqualify such a person from service on a jury. A jailer is a *927 custodian and an administrator. He is not active in the competitive business of law enforcement. It is possible that his position might have produced such relationships as could disqualify him in a particular case or attitudes which would disqualify him as a juror, generally, but the experience as a jailer is not one which can be expected to destroy an otherwise impartial attitude of the prospective juror. Such disqualification must be brought out on the voir dire, and must be shown by the record.

"We do not mean to indicate that one who is employed by the sheriff, or the parish as a jailer when he is drawn to serve as a juror should not be disqualified. The effect of his current employment can easily be understood to influence his decision. Here, the prospective juror had been retired for four or five years, after twenty years service. No current relationship with law enforcement agencies appears. We cannot say that the effect of the twenty year period as a jailer would destroy the impartiality expected of a juror." 410 So.2d at 710-711. (Emphasis supplied)
Mrs. Pate's employment for eighteen months as a tower guard, a job which she left six years before trial because it was "boring", is hardly the type of law enforcement experience which would tend to destroy impartiality. See also State v. Wilkerson, 326 So.2d 353 (La.1976). The trial judge accepted her statement that she could decide the case impartially despite her prior law enforcement background, and we cannot say that the judge abused his discretion in doing so.
As to Mrs. Pate's previous employment supervised by a state witness, that relationship, considered with the nature of the witness' testimony concerning an uncontroversial (although important) autopsy report, is not the type from which one would infer the likelihood of partiality. State v. Smith, 437 So.2d 802 (La.1983).
Finally, Mrs. Pate's impersonal interest in the victim does not justify a conclusion that the trial judge abused his discretion in denying the challenge for cause. She had absolutely no relationship with the victim or her family. Because of the curiosity which prompted Mrs. Tate to visit the funeral home to identify the victim in her own mind, it might have been more prudent for the trial judge to excuse her for cause. However, in view of the assertions of impartiality by this juror who was then employed as a social worker, we cannot say that reversal of the conviction is required because the trial judge abused his discretion in refusing to excuse her.
"Witherspoon" Challenges (Assignments of Error Nos. 6, 7, 8, 9, 11, 12, 13 and 14)
Defendant complains that the trial court sustained challenges for cause for eight jurors who expressed opposition to the death penalty. He principally argues that the exclusion of all jurors who express scruples about the death penalty constitutes a systematic exclusion of an identifiable segment of the population and that the remaining "death-qualified" jurors are "conviction prone".
Acceptance of defendant's argument would require two juries, one (which would not be death-qualified) to determine guilt or innocence and a second jury (which would be death-qualified) to determine sentence. Such a procedure is inconsistent with codal provisions governing the trial of capital cases in Louisiana. Nevertheless, defendant cites Grigsby v. Mabry, 569 F.Supp. 1273 (E.D.Ark.1983), affirmed 758 F.2d 226 (8th Cir.1985), in support of his claim and urges this court to rule that death-qualified juries selected under present statutes are not representative of the community.
In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Court stated that the data in support of a claim that death-qualified jurors are conviction prone was either non-existent or "too tentative and fragmentary" to warrant such a conclusion. 391 U.S. at 517-518, 88 S.Ct. at 1774-1775. This court has consistently declined to adopt a contrary view.
*928 State v. James 431 So.2d 399, 420 (La. 1983); State v. Monroe, 397 So.2d 1258 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983).
Defendant's final claim concerns the standard used by the trial court to exclude four prospective jurors. He contends that those jurors did not make "unmistakenably clear" their opposition to the death penalty, as required by La.C.Cr.P. Art. 798(2).
In Wainwright v. Witt, ___ U.S. ___, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court recently "clarif[ied]" its decision in Witherspoon and adopted an arguably less stringent standard. The Court stated:
"That standard is whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that in addition to dispensing with Witherspoon's reference to `automatic' decision-making, this standard likewise does not require that a juror's bias be proved with `unmistakable clarity.' This is because determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many venireman simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear'...." ___ U.S. at ___, 105 S.Ct. at 852.
The court further observed that the standard for an appellate court's review of a trial court's decision to seat or reject a juror for cause is whether or not the court's finding was "fairly supported by the record." ___ U.S. at ___, 105 S.Ct. at 857. Nevertheless, even under the Louisiana's statutory standard based on the Witherspoon decision and incorporated in La.C.Cr.P. Art. 798(2), defendant's complaint about the exclusion of these four prospective jurors is without merit. All four prospective jurors indicated an inability to consider the death penalty as a possible verdict. The jurors were properly excused.
Discovery Violations (Assignments of Error Nos. 15, 16 and 17)
Defendant contends that his statements to Abraham Mingo and Reginald Jackson should not have been admitted into evidence, since these statements were not listed in the state's discovery responses.
As part of his discovery motion, defendant inquired about the existence and substance of any oral statements by defendant. The prosecutor's response listed only the two statements to police officers.
On the day of trial, the prosecutor filed a notice that she would introduce other statements which defendant made during the planning, commission or concealment of the crime. During questioning of Jackson and Mingo, the prosecutor sought to elicit testimony about the statements defendant made to these witnesses. The defense objected, arguing the prosecutor's failure to include these statements in her discovery responses required their exclusion from trial. The trial court overruled the objection, denied the requested sanction, denied a motion for a mistrial and permitted the testimony, which was very damaging to defendant's case.[9] On appeal, defendant claims the surprise and prejudice of this testimony requires reversal of the conviction.
The discovery responses were deficient. However, exclusion of evidence or declaration of a mistrial are not required in all cases of discovery violations. La.C. Cr.P. Art. 729.5. The failure to comply fully with discovery rules does not constitute reversible error unless actual prejudice results. State v. Busby, 464 So.2d 262 (La.1985).
Here, the prosecutor informed defense counsel verbally of the nature and substance of defendant's statements to *929 Mingo and Jackson where she responded to a motion for exculpatory evidence.[10] Defense counsel was also aware that these witnesses would be called to testify. Counsel complains only that he was not informed in writing that the testimony of these witnesses as to defendant's statements would be used at trial.
Counsel knew Mingo had been granted immunity and was going to testify as a witness for the prosecution. Because of the damaging nature of the statements, counsel should have known the evidence would be used at trial. (Indeed, the prosecutor asserted she had told defense counsel the statements would be used.) Therefore, counsel was not surprised or prejudiced when his client's statements to Jackson and Mingo were introduced. Under these circumstances, there was no error in refusing to exclude the evidence or to grant a mistrial.
Admission of Inconsistent Statements (Assignment of Error No. 18)
Defendant complains that both of his recorded statements to the police were introduced at trial. Because both were allowed in evidence, he argues, the state was permitted to attack his credibility without his being sworn as a witness and to depict him as a liar to the jury. Additionally, he complains the statements were used by the state as substantive evidence of his guilt.
In the first statement, defendant denied any knowledge of the crime. Defendant objected to the statement as being hearsay evidence. However, hearsay evidence is that which is offered to show the truth of the matter contained therein, and this statement certainly was not offered for that purpose.
In his second statement, defendant admitted that he was present when the victim was kidnapped, but denied any participation in the victim's abduction and murder. That declaration was admissible as an admission that he was at the scene of the crime. State v. Lewis, 416 So.2d 921 (La.1982).
The complaint about the use of inconsistent statements in tandem was considered and rejected in State v. McDonald, 387 So.2d 1116 (La.1980), cert. den. 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980). The court stated:
"We find no merit in defendant's argument that introduction of the statements amounted to impeachment of defendant who did not testify at trial. The statements were admissible as proof of the extent of defendant's knowledge of the crime. The August 9, 1977 statement indicates only defendant's reluctance to elaborate further on the events concerning the crime or his desire to remain silent. At best, it is an exculpatory statement which the state may introduce or withhold. In State v. Guillory, 373 So.2d 133 (La.1979), we upheld the state's refusal to introduce such a statement before the accused testified and declined to allow the accused to introduce the statement on the ground that to do so would bring his statement before the jury without subjecting him to cross-examination with respect thereto.
"Impeachment of an accused does not occur until the accused testifies. La.R.S. 15:462, 486, 493. When introduced in presentation of the state's case in chief, inconsistent statements, whether inculpatory or exculpatory, are not subject to procedural rules governing impeachment of witnesses." 387 So.2d at 1121.
The state was entitled to use either or both of defendant's statements. The use of both to show defendant's "guilty mind" was legitimate prosecutorial strategy. Purposeful lying or deliberate misrepresentation has been recognized as indicative of an awareness of wrongdoing. State v. Captville, 448 So.2d 676, 680 n. 4 (La. 1984); State v. Rault, 445 So.2d 1203 (La. 1984). The fact that defendant had given conflicting statements with regard to his *930 whereabouts on the night of the crime was therefore clearly relevant to the case, and the trial court did not err in admitting the evidence.

SENTENCING PHASE
Reference to Appellate Review (Assignments of Error Nos. 35 and 36)
Defendant contends the prosecutor interjected an arbitrary factor into the proceedings by referring to appellate review during rebuttal argument in the penalty phase.
In a brief rebuttal argument, the prosecutor concentrated on the death penalty as the most appropriate sentence for this crime. Arguing that a vote for life imprisonment would accord mercy to an offender who had shown no mercy for his victim, the prosecutor stated:
"I don't know where in the world you could find an offense that is more horrible than what she went through that night when she was kidnapped from her home and she was beaten and she was raped and she was strangled until she died. I can't think of anything more horrible than that for an eleven-year-old child. It would be easy for you to return life imprisonment. I know it's going to be a difficult decision. We all go through difficult decisions, and this will probably be the most difficult decision you ever make in your life. That's why each and every one of you were questioned so carefully at the very beginning to see whether or not you could consider the death penalty because it was a possibility and we knew that it would be difficult and it would be something that you would have to weigh and consider very carefully. Also, too, I would like to state that if, in fact, you do return the death penalty that yours will not be the last word. Every sentence is reviewed by the Supreme Court to determine whether or not...."
At this point, defense counsel's objection was sustained by the trial court. Counsel then requested the court to impose a life sentence, because the remarks had "tainted" the jury. Alternatively, counsel asked for a mistrial. Both requests were denied after argument outside the presence of the jury, but the court admonished the jury as follows:
"The jury is hereby admonished and instructed to disregard the last comment, the statement of the prosecutor in the case. Proceed."
In State v. Berry, 391 So.2d 406 (La. 1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981), this court warned prosecutors about commenting on appellate review of death sentences, as follows:
"Any prosecutor who refers to appellate review of the death sentence treads dangerously in the area of reversible error. If the reference conveys the message that the jurors' awesome responsibility is lessened by the fact that their decision is not the final one, or if the reference contains inaccurate or misleading information, then the defendant has not had a fair trial in the sentencing phase, and the penalty should be vacated.
"But virtually every person of age eligible for jury service knows that death penalties are reviewed on appeal. There is no absolute prohibition against references to this fact of common knowledge, and this court should not impose an absolute prohibition, since such a reference does not necessarily serve to induce a juror to disregard his responsibility.1 The issue should be determined in each individual case by viewing such a reference to appellate review in the context in which the remark was made.
"1 Judicial restraint is particularly important in the area of absolute and inflexible prohibitions, since such rules are inconsistent with the very nature of the judicial process. Moreover, when an absolute prohibition is adopted, as the Legislature did in C.Cr.P. art. 770's prohibition against commenting on the defendant's failure to testify, the court must decide in each case whether the remark constitutes a prohibited comment. See, for example, State v. Fullilove, 389 So.2d 1282 (La.1980)." 391 So.2d at 418
Nevertheless, when the remark was so brief or innocuous that it would not reasonably induce a juror to believe that his responsibility *931 was lessened by appellate review, the death sentence has been affirmed. State v. Knighton, 436 So.2d 1141 (La.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Moore, 414 So.2d 340 (La.1982), cert. denied 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983); State v. Mattheson, 407 So.2d 1150 (La.1981), cert. denied 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); State v. Monroe, 397 So.2d 1258 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1411 (1983). On review, the ultimate question is whether the remark deprived defendant of a fair trial at the sentencing hearing.
The prosecutor's remarks in this case were similar to those in Knighton, above, in which the prosecutor told the jury:
"[T]he Court will impose the sentence [that] you do recommend, it is automatically reviewed by the Louisiana Supreme Court to determine if it was excessive or a proper sentence." 436 So.2d 1157
The Knighton decision distinguished this comment from the "lengthy" remarks which resulted in reversal in State v. Willie, 410 So.2d 1019 (La.1982). In that case, the prosecutor emphasized appellate review at length, stating inaccurately that "everything will more than likely be reviewed by every appeals court in the State, including the Supreme Court of this state ... and then the federal appeal begins, both in district courts, the federal district court, the federal appellate courts, and the Supreme Court of the United States of America...." 410 So.2d 1034. The prosecutor then added that "the buck really don't stop with you".[11]
The Supreme Court of the United States recently considered this issue in Caldwell v. Mississippi, ___ U.S. ___, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In closing argument, defense counsel pleaded with the jurors to exercise their right to spare defendant's life, emphasizing that his life rested in their hands and that they were the judges who would decide his fate. In rebuttal, the prosecutor called the comments unfair, stating that "they would have you believe that you're going to kill this man and they knowthey know that your decision is not the final decision". When defense counsel objected, the trial judge overruled the objection and approved the argument, observing that the jurors should realize that the death penalty is automatically reviewable "so they will not be confused". The prosecutor then reemphasized that the jurors' decision is not the final decision and is automatically reviewable by the supreme court.
The Court reversed the death penalty, concluding that the reliability of the jury's sentence had been placed in doubt by the "state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court". The Court noted that the particular comments on appellate review were misleading and that such "uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role". The Court emphasized that the judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them ... strongly implying that the prosecutor's portrayal of the jury's role was correct". The majority ruled that "[s]uch comments, if left uncorrected, might so affect the fundamental fairness of the sentencing procedure as to violate the Eighth Amendment".
The brief remark in the present case, unlike the comments in the Caldwell case, was not left uncorrected. When the prosecutor in the present case first mentioned appellate review, defense counsel immediately cut her off. The trial judge not only sustained the objection, but also admonished the jury to disregard the comment. Under these circumstances, there was no reasonable possibility that the comment led the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere" *932 or deprived the defendant of a fair trial in the sentencing hearing.
Requested Jury Instructions (Assignment of Error No. 33)
Defendant complains of the trial court's denial of nine special jury instructions requested in the penalty phase of the trial. Counsel groups the requested charges into five: (1) the jury must weigh aggravating circumstances against mitigating circumstances in order to reach sentencing recommendation; (2) the jury need find mitigating circumstances only by "any substantial evidence" or by a "preponderance of evidence" (as opposed to aggravating circumstances which must be found beyond a reasonable doubt); (3) the jury has the option to return a life sentence even if it finds one or more aggravating circumstances; (4) the jury may presume that a recommendation of life means life at hard labor without parole and that death means death in the electric chair; and (5) the jury's inability to agree unanimously on sentence recommendation results in a sentence of life imprisonment without parole.
A trial judge is required to give a special requested charge only if it is wholly correct and pertinent and not otherwise covered by the general charge. La.C.Cr.P. Art. 807; State v. James, 431 So.2d 399 (La.1983).
As to the weighing of circumstances, an accused does not have the right to have the jury instructed that it should recommend the death penalty only if the aggravating factors outweigh the mitigating factors. State v. Flowers, 441 So.2d 707 (La.1983). Moreover, the "weighing" process was implicit in the court's instruction that "[y]ou are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed" and that "even if you find the existence of an alleged aggravating circumstance relied on by the state you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed". Arguably, the court should have added "or a sentence of life imprisonment" to make the charge completely evenhanded. The court's instruction, however, clearly informed the jurors that they may not recommend a death sentence until they have found beyond a reasonable doubt the existence of at least one statutory aggravating circumstance and have concluded, after considering any mitigating circumstances, that the death sentence should be imposed in this case. La.C.Cr.P. Art. 905.3.
As to the standard of proof for mitigating circumstances, counsel argues that the judge emphasized the reasonable doubt standard in the guilt stage and in the sentencing phase with respect to aggravating circumstances, but was silent as to the standard of proof for mitigating circumstances, thus misleading the jury into believing the same standard should apply.
In State v. Sonnier, 402 So.2d 650 (La. 1981), this court stated that "[t]his capital sentencing procedure does not establish any presumptions or burdens of proof with respect to mitigating circumstances". Moreover, counsel's special requested charges may have prevented the jury from using a lower standard ("some" or "any" evidence) to find mitigating circumstances. The trial court did not err by instructing the jury, exactly as the law is written in La.C.Cr.P. Arts. 905.3 and 905.5, that any mitigating circumstances may be considered, even those which are not specifically listed.[12]
As to the jury's option to return a life sentence, even if it found one or more aggravating circumstances had been proved beyond a reasonable doubt, the judge began the instruction by telling the jury of its two options. The judge then explained that if the jury unanimously found the existence of at least one statutory aggravating circumstance, "you may *933 consider imposing a sentence of death".[13] After explaining the aggravating and mitigating circumstances, the judge then informed the jury of the two verdict forms and instructed that if the jury decides that a life sentence without benefit of probation, parole or suspension of sentence should be imposed, the foreman need only sign that form of verdict and that "[n]o listing of aggravating or mitigating circumstances is required on that form". When the general charge is considered in its entirety, the jury could hardly have failed to understand that there were two sentencing alternatives, one of which could only be imposed after a unanimous finding of at least one aggravating circumstance, and that the function of mitigating circumstances was to "mitigate the severity of the penalty to be imposed".
The purpose of counsel's requested instruction to assume that "life means life" was to prevent the jury from speculating on the possibility of early release from life imprisonment or of reversal on appellate review. The judge did expressly instruct the jury that "[i]t is your responsibility in accordance with the principles of law I have instructed, to determine whether the defendant should be sentenced to death or life imprisonment without the benefit of probation, parole, or suspension of sentence".
The requested instruction was not required by law. Indeed, such a charge calls the jury's attention to the possibility of early release. The trial court did not err by instructing the jury exactly as the law is written in La.C.Cr.P. Art. 905.
Finally, defendant contends that the jurors should have been informed prior to deliberations that a sentence of life imprisonment without parole would be imposed if they were unable to agree unanimously on a sentencing recommendation. Defense counsel submitted the following requested jury instruction:
"In this proceeding your verdict must be unanimous before you can sentence [defendant] to death. Each of you must put in writing whether the statutory aggravating circumstances alleged by the prosecution exist or do not exist, and each of you must sign that finding. If you are unable to unanimously agree that [defendant] should be executed by electrocution, he will automatically be sentenced to a term of life imprisonment (without the possibility of parole)."
The trial judge refused to give the requested instruction and proceeded to instruct the jury as follows:
"If you find beyond a reasonable doubt that any of the relied on statutory aggravating circumstances existed you may consider imposing a sentence of death. If, however, you do not unanimously find beyond a reasonable doubt that any of the relied upon statutory aggravating circumstances existed then life imprisonment without benefit of probation, parole or suspension of sentence is the only sentence that may be imposed."
Later in the instruction, the judge told the jury:
"I will ask the clerk in a few moments to hand to the foreman two blank forms of verdict. The first form of verdict reads, and I quote, `Having found the below listed statutory aggravating circumstance or circumstances and after consideration of mitigating circumstances offered, the jury recommends that the defendant be sentenced to death'. In the event you unanimously, that is, all twelve of you, decide the death penalty should be imposed, a space is provided to write the statutory aggravating circumstance or circumstances you unanimously find to exist. The foreman will then sign the form. The second form of *934 verdict which you will be allowed to bring into the jury room reads, as follows, and I quote, `The jury unanimously recommends that the defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence'. If the jury decides that a life sentence without benefit of probation, parole or suspension of sentence should be imposed, the foreman need only sign that form of verdict. No listing of aggravating or mitigating circumstances is required on that form.
* * * * * *
"These are the two verdict forms. And this is the first one I mentioned with the lines available to write the aggravating circumstance or circumstances you find should you find any. Then write today's date and the foreman must sign it. That would be the form you would use if you unanimously decide to return the death sentence in the case. Should the twelve of you decide that life imprisonment without benefit of probation, parole or suspension of sentence is appropriate this would be the form that you'd just date and the foreman would sign." (Emphasis supplied)
As to the need for a unanimous recommendation of sentence, La.C.Cr.P. Art. 905.6 provides:
"A sentence of death shall be imposed only upon the unanimous recommendation of the jury. If the jury unanimously finds the sentence of death inappropriate, it shall recommend a sentence of life imprisonment without benefit of probation, parole or suspension of sentence."
Article 905.7 then provides the forms for the two possible verdicts.[14] Article 905.8, pertaining to imposition of sentence, further provides:
"The court shall sentence the defendant in accordance with the recommendation of the jury. If the jury is unable to unanimously agree on a recommendation, the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence."

The cases involving the court's instructions to the jury on unanimity of sentence recommendation have been troubling. In State v. Myles, 389 So.2d 12 (La.1980) (sentence rev'd. on rehearing on other grounds), defense counsel complained on appeal that the trial court failed to inform the jury that the court would impose a sentence of life imprisonment without parole if the jury was unable to agree unanimously on a sentence recommendation. The trial court had given an instruction almost identical to the one in this case. Defense counsel at trial apparently had not requested a special instruction or objected to the court's instruction. This court concluded:
"The jurors were informed of only two possible recommendations and were instructed that any response other than a unanimous recommendation of death, coupled with a supported finding of an aggravating circumstance, would result in a sentence of life imprisonment. From this charge a reasonable juror could infer that failure to reach a unanimous sentence recommendation would result in life imprisonment."[15] 389 So.2d at 17.
In State v. Perry, 420 So.2d 139 (La. 1982), the same argument was raised, and *935 this court responded by quoting the above language from Myles.
No previous case has involved a pre-deliberation request for an instruction on the consequences of the jury's inability to agree unanimously on a recommendation. However, in State v. Williams, 392 So.2d 619 (La.1980) (on rehearing), the foreman, after three hours of deliberation, asked the judge if the verdict had to be unanimous. The judge informed the jury that either recommendation, death or life imprisonment, must be unanimous, emphasizing the word "must". The foreman responded that they were unable to reach a verdict. When the judge asked if further deliberation might be helpful, the foreman suggested deliberation for another thirty or forty minutes. Forty-five minutes later, the jury returned a unanimous recommendation of death.
This court set aside the death penalty. The plurality opinion noted that the failure to inform the jury of the consequences of inability to agree unanimously on a recommendation left the jurors free to speculate on the outcome and "may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings". The concurring opinion observed that when the jury, after a significant attempt to achieve unanimity, questions the court about the consequences of a failure to do so, fundamental fairness dictates that the jury should not be required to speculate on the answer which is provided by law. Substantial prejudice to the defendant might result under such circumstances, because the substantial possibility of disagreement has been shown.
In State v. Loyd, 459 So.2d 498 (La.1984), the jury deliberated for about one hour and then asked the judge if the vote for the death penalty had to be unanimous. At that point, defense counsel requested an instruction that the court will impose a life sentence if the jury cannot agree unanimously. Nevertheless, the judge instructed the jury only that it must be unanimous in the recommendation of the death sentence or of life imprisonment. The jury unanimously recommended the death sentence eighteen minutes later.
This court set aside the death sentence, because the circumstances suggested that "at least one minority juror was pressured to acquiesce in a death penalty recommendation merely to reach the required unanimity".
In the present case, there was a pre-deliberation request for an instruction that a sentence of life imprisonment would be imposed if the jury failed to agree unanimously on a sentence recommendation. This request raises the issue of whether the defendant has a legislative right to such an instruction. An additional issue is whether the defendant was prejudiced in this particular case by the court's refusal to give the instruction prior to deliberation.
We note first that the requested instruction was not wholly correct and required qualification, limitation or explanation.[16] La.C.Cr.P. Art. 807. Nevertheless, the substance of at least part of the requested instruction was that the jury should be informed that its inability to agree unanimously on a sentence recommendation would result in a life sentence. We therefore decline to decide the issue on the basis of Article 807.
The statutory scheme requires the jury to agree unanimously in order to make any recommendation which is binding on the *936 court. La.C.Cr.P. Art. 905.6 and 905.8. If the jury cannot agree unanimously, there simply is no binding jury recommendation. However, Article 905.8 limits the court in such a case, and the judge cannot himself decide the sentence or order a new sentencing hearing, but must impose a sentence of life imprisonment without parole.
It is evidence that the second sentence of Article 905.8 (requiring a life sentence in the event of the jury's failure to agree unanimously) has no pertinence when the jury retires to deliberate and immediately returns a unanimous recommendation. Only when the jury is unable to agree unanimously, as in the Williams and Loyd cases, does the second sentence of Article 905.8 come into play. In such a case, an instruction on the consequences of inability to agree is dictated by the need to avoid jury confusion and to prevent an arbitrary result.[17]
In the present case, the jury deliberated for seventy-four minutes and unanimously recommended the death penalty. Unlike Williams and Loyd, there was no indication that the jury might not have been able to agree unanimously. The jury was quickly able to reach a recommendation, and that recommendation was in fact unanimous. Also unlike Williams and Loyd, there was no suggestion of the possibility of jury confusion that might have prejudiced defendant. Under such circumstances, there is no justification for reversal of the death penalty, either on the basis that defendant had a legislative right to the instruction or on the basis that he was prejudiced by the court's failure to give the instruction.

SENTENCE REVIEW
La.C.Cr.P. Art. 905.9 requires this court to review every sentence of death to decide whether the sentence is excessive. In doing so, this court determines (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the evidence supports the jury's finding of at least one statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the sentence imposed in similar cases, considering both the crime and the defendant. Supreme Court Rule XXVIII.
Passion, Prejudice, or Other Arbitrary Factors
Defendant is a black male who was twenty-eight years old at the time of the offense. The fifth of fourteen children, he never married and has no dependents. He had no juvenile arrest or conviction record. In 1974, he was convicted of simple burglary and was sentenced to three years at hard labor. In 1976, he was convicted of carrying a concealed weapon and sentenced to thirty days in parish prison. In 1977, he was convicted of aggravated battery (reduced from forcible rape and attempted second-degree murder).[18] In 1982, he was *937 convicted of driving while intoxicated and placed on one-year probation, which was later revoked. The present offense occurred in 1984.
Defendant had a spotty employment history. Except for baby-sitting for family members, he had been unemployed since his release from the penitentiary in January, 1982. His intelligence was reported as normal, and school records indicate an IQ of 85.
The victim was a black female, age eleven. Defendant knew her because of his relationship with her mother. Race was apparently not a factor in the proceedings.[19]
Defendant specifically complains that passion and prejudice were interjected into the jury's deliberations by the prosecutor's references to the victim as "that little girl", the repeated emphasis on the child's age, and the questions asked of the family which were not relevant to any contested issue.
There was no undue emphasis on the child's background, character or habits. With respect to her age, the state was required to prove, as an element of first-degree murder, that an aggravated rape had occurred. Thus, the state had to establish, beyond a reasonable doubt, not only that a rape had occurred, but also that the victim was under the age of twelve. La.R.S. 14:30(1), 41 and 42(4). The prosecutor properly proved and argued this element of the offense. Furthermore, it was not improper for the prosecutor to contrast the innocence of the victim with the horror of the manner in which she was killed.
Aggravating Circumstances
The jury found the existence of two statutory aggravating circumstances: (1) the offender was engaged in the perpetration or attempted perpetration of an aggravated rape and (2) the offense was committed in an especially heinous, atrocious or cruel manner.
The finding that the offense was committed during an aggravated rape was fully supported by the record, as noted in the discussion of the sufficiency of the evidence in the guilt phase.[20]
It is unnecessary to determine whether the other statutory aggravating circumstance returned by the jury is supported by the record. When at least one aggravating circumstance returned by the jury is supported by the record, the death sentence may be upheld even if an additional aggravating circumstance returned by the jury is not supported by the record, as long as the evidence offered in support of the arguably unproved aggravating circumstance did not inject an arbitrary factor into the proceedings. Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); State v. Sawyer, 422 So.2d 95 (La. 1982); State v. Wilson, 467 So.2d 503 (La. 1985).
In the present case, the evidence offered in support of the statutory aggravating circumstance that the homicide was committed *938 in an especially heinous, atrocious or cruel manner did not inject an arbitrary factor into the proceedings. The evidence was relevant and admissible, both in the guilt and penalty phases. Because this evidence was otherwise admissible, defendant suffered no prejudice because the jury, on the basis of this evidence, concluded that this murder was especially heinous.

Proportionality
Comparative proportionality review is not constitutionally required, as long as the overall capital sentencing scheme otherwise contains adequate safeguards to protect against arbitrary imposition of the death penalty. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).[21] However, comparative proportionality review is still a relevant consideration in determining the issue of excessiveness, and in Louisiana there is a court rule requiring such a review.
In reviewing other cases in which the death penalty was recommended by the jury, the court compares the aggravating and mitigating circumstances of this case to determine if this death penalty recommendation was the "action of an aberrant jury".[22]Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976).
Juries in the 19th Judicial District have returned the death penalty only four times since 1976, including the present case. The other three were all homicides which occurred during armed robberies.[23] However, the aggravating circumstance of a murder during the perpetration of certain felonies represents a legislative response to the public's fear of certain crimes. To that extent, the four cases all involve the aggravating circumstance listed in La.C.Cr.P. Art. 905.4(a).
The present case may also be compared to State v. Brogdon, 426 So.2d 158 (1983), affirmed after remand 457 So.2d 616 (1984), cert. denied ___ U.S. ___, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985), and State v. Willie, 410 So.2d 1019 (La. 1982), affirmed after remand, 436 So.2d 553 (La.1983), cert. denied ___ U.S. ___, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984).
*939 The Brogdon case involved the rape and murder of an eleven-year old child. Defendant was nineteen years of age, without dependents. Abused as a child, he and his four siblings were taken away from their father and placed in foster care. His work history was poor, and he used drugs heavily. He had some trouble as a juvenile and had run away from foster homes. He completed sixth grade, was a diagnosed borderline personality, and his I.Q. fell between 60-80.
In Willie, defendant and an accomplice lured an eighteen-year-old woman into their car, took her to wooded spot, and raped her. Afterwards, one held her hands, while the other repeatedly stabbed her in the neck. The twenty-five-year old defendant had a substantial criminal record. His I.Q. was 81.
When both the offense and the offender in the present case are compared with those in the similar cases, it cannot be said that defendant's sentence of death was disproportionate.

DECREE
The conviction and sentence are affirmed. However, this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until (1) defendant fails to file a timely petition for certiorari in the Supreme Court of the United States, (2) the Court denies defendant's timely petition for certiorari, if one is timely filed, and the Court denies defendant's petition for rehearing on the petition for certiorari, if one is timely filed, or (3) further orders of this court.
DIXON, C.J., dissents with reasons.
DIXON, Chief Justice (dissenting)
I respectfully dissent.
The challenge for cause of the juror Pate should have been sustained; the failure to instruct the jury on the effect of a lack of unanimity was error.
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[2] La. Const. Art. I § 17 (1974) provides:

"A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, five of whom must concur to render a verdict. The accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law. Except in capital cases, a defendant may knowingly and intelligently waive his right to a trial by jury." (Emphasis supplied)
[3] The Constitution of the United States does not guarantee the right to peremptory challenges. Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919).
[4] The size of juries and the number required to concur in the verdict may be significant constitutional issues. Ballew v. Georgia, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978); Burch v. Louisiana, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979). Those issues involve other considerations, however, such as the promotion of jury deliberation and the providing of a reasonable cross-section of the community.
[5] One of defense counsel's arguments in this case is that peremptory challenges are necessary to exclude a prospective juror who becomes offended by counsel's probing to determine partiality. The question is whether this reduction in the number of permitted peremptory challenges unduly restricts counsel's ability to conduct effective questioning so as to obtain a fair jury.
[6] After the challenge failed, defense counsel exercised his sixth peremptory challenge and excused the juror.
[7] In urging his challenge for cause, counsel stated as his only grounds that "she was a guard there at the same time Mr. Jones was there". Counsel also said that her work as a law enforcement officer "would affect her ability to be a fair and impartial juror". On appeal, counsel attempts to assert additional grounds.
[8] Defendant was incarcerated at Angola while Mrs. Pate worked there. However, Mrs. Pate did not recognize defendant, and she stated that she had little contact with the prisoners.
[9] The real import of Jackson's testimony was his identification of the tennis shoes, blue jeans and pink sweatshirt worn by defendant on the night of the murder. Mingo's testimony (concerning defendant's admission of doing "something he didn't want to do" and his request to dispose of the TG & Y bag) was especially damaging because he was defendant's half brother.
[10] The trial judge asked defense counsel if he denied the district attorney's assertion that she provided him with the substance of defendant's statements to Mingo. Counsel replied simply that the information "is not in the written answer to the Brady motion".
[11] See also State v. Robinson, 421 So.2d 229 (La.1982).
[12] The trial court read the statutory mitigating circumstances in Article 905.5 and told the jury that "[y]ou are not limited only to those mitigating circumstances which are specifically defined because ... you can consider any other relevant mitigating circumstance which you feel should mitigate the severity of the penalty to be imposed."
[13] The trial judge used almost verbatim the closing instructions from Louisiana Judges Benchbook. Vol. 1, p. 7.17 (La.Judicial College 1980). However, he omitted the sentence that "[t]he finding of an aggravating circumstance does not mean that you must impose the death penalty".

Unlike State v. Watson, 423 So.2d 1130 (La. 1982), this instruction does not provide the jury with incorrect information. Moreover, the instruction cannot reasonably be said to have mislead the jury, when the instructions are viewed in their entirety.
[14] Curiously, only the form for recommendation of a life sentence specifies that the recommendation is unanimous.
[15] The court's reasoning was arguably based on a false premise. Nowhere in the opinion does it appear that the judge informed the jury that "any response other than a unanimous recommendation of death, coupled with a supported finding of an aggravating circumstance, would result in a sentence of life imprisonment". The only mention of unanimity in the portion of the instruction quoted in the opinion related to a unanimous finding of the existence of at least one statutory aggravating circumstance.
[16] There is no requirement that each juror write or sign a decision on the existence of statutory aggravating circumstances. Moreover, the requested instruction confuses the requirement of unanimity in the decision on the existence of at least one statutory aggravating circumstance with the decision on the sentence recommendation.
[17] Of course, the trial judge may always give such an instruction at the outset in order to avoid the possibility of prejudice. At that point in time, the judge has no way of knowing whether there will be disagreement throughout a substantial period of deliberation, followed by a unanimous (but perhaps prejudicially tainted) recommendation.

The author notes that the prudent course for the trial judge is to give an outset instruction that the jury's failure to agree unanimously will result in an automatic sentence of life imprisonment without parole, while at the same time instructing the jury of its duty to deliberate diligently with the view of reaching a unanimous recommendation if at all possible. See State v. Loyd, above (Lemmon, J., concurring); see also the recommendation of the Benchbook Committee in Louisiana Judges Benchbook, Vol. 1, p. 7.26 (La.Judicial College 1985).
[18] The victim of the aggravated battery was a twenty-year old black female. Defendant abducted her, brought her to a cane field, raped her and told her to say her prayers before stabbing her and leaving her for dead. He was sentenced to nine years on a guilty plea.
[19] The Uniform Capital Sentence Report notes that there were no blacks on the jury. There is no contention, however, that this factor played any part in the outcome of the trial or in the sentence.
[20] Since the 1979 amendment to La.R.S. 14:30 incorporating an aggravating element into the definition of first degree murder, the state has been required to prove in the guilt phase the existence of one of the more serious statutory aggravating circumstances. Thus, Rule XXVIII's requirement of the finding of at least one statutory aggravating circumstance has been fulfilled when there has been a valid conviction in the guilt phase.
[21] The death penalty is not disproportionate to the crime of first degree murder. Pulley v. Harris, above. The role of proportionality review is to compare the sentence in the instant case with the sentences of others convicted of the same crime.
[22] Comparative proportionality review by this court has focused principally on mitigating circumstances. The only reversal of a death penalty on the sole basis of disproportionality under the statutory system adapted in 1976 was State v. Sonnier, 380 So.2d 1 (La.1979), in which the defendant's relatively minor role in the crime took place under the dominance of his older brother. The death penalties which were reversed because of a lack of proof of aggravating circumstances involved crimes committed before the 1979 amendment added aggravating elements to La.R.S. 14:30's definition of first degree murder. See, for example, State v. Culberth, 390 So.2d 847 (La.1980), in which the crime would not even qualify as first degree murder under the present statutory definition. Because the present definition of first degree murder requires that an aggravating element in the guilt phase of a bifurcated capital trial has been proved beyond a reasonable doubt, a reviewing court which upholds a conviction of first degree murder has necessarily found the existence of at least one of the four most serious aggravating circumstances. After the state has proved an aggravating element of the crime of first degree murder in the guilt phase, the jury must consider any mitigating circumstances and may still recommend life imprisonment without parole. Compare the mandatory death penalty statutes struck down by five-to-four decisions in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), and Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977).
[23] The other death penalty cases were State v. Williams, 392 So.2d 619 (La.1980), which was reversed on appeal; State v. Williams, 383 So.2d 369 (La.1980); and State v. Clark, 387 So.2d 1124 (La.1980). After Clark's conviction and sentence were set aside by the federal courts, he entered a guilty plea and received a life sentence.